Gilbert KERLIN, Individually, Gilbert
Kerlin, Trustee, Windward Oil & Gas
Corp., and PI Corp., Petitioners,

v.

Concepcion SAUCEDA,
et al., Respondent.

No. 05–0653.

Supreme Court of Texas.

Argued April 22, 2008.

Decided Oct. 10, 2008.

Claudia Wilson Frost, Jeremy J. Gaston, Pillsbury Withrop Shaw Pittman LLP, Houston, TX, Andrew L. Frey, Mayer Brown LLP, New York, NY, Russell H. McMains, Law Offices of Russell H. McMains, Corpus Christi, M. Steve Smith, M. Steve Smith & Associates, Houston, Horacio L. Barrera, Martinez & Barrera, L.L.P., Brownsville, TX, for Petitioners.

Tom C. McCall, David B. McCall, The McCall Firm, Austin, Britton D. Monts, Monts & Ware, L.L.P., Dallas, Hector H. Cardenas, Robert Francis Johnson III, Assistant Attorney General, Austin, Frank Costilla, Law Offices of Frank Costilla, Brownsville, Alberto T. Garcia III, Law Offices of Alberto T. Garcia III, McAllen, TX, for Respondents.

Esmeralda Carroll, San Antonio, Rebecca Gomez Sexton, Brownsville, Ramon Donato Garcia, San Benito, Rafael Garcia, Hortencia Garcia, Pedro Garcia, Brownsville, Sandra Dale Pappagiorgio, Houston, George Butcher, San Antonio, TX, pro se for person interested in case.

Jules L. Laird Jr., Houston, E. Lawrence Vincent Jr., Attorney At Law, Plano, Alberto T. Garcia III, Law Offices of Alberto T. Garcia III, McAllen, TX, Attorneys for person interested in case.

Rance L. Craft, Office of Attorney General, Austin, TX, for Amicus Curiae.

Justice O'NEILL delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice WAINWRIGHT, Justice MEDINA, Justice GREEN, and Justice JOHNSON joined.

In 1829, the State of Tamaulipas, Mexico, recognized the claims of Padre Nicolas Balli and his nephew, Juan Jose Balli, to Padre Island. Since then, the island's ownership has been the subject of numerous legal disputes, including the present one. *See, e.g., U.S. v. 34,884 Acres,* No. C.A. 142 (S.D.Tex.1948), *aff'd sub nom De Lourett v. Kerlin,* 182 F.2d 750 (5th Cir. 1950); *State v. Balli,* 144 Tex. 195, 190 S.W.2d 71 (1944); *Havre v. Dunn,* No. 6515 (103rd Dist. Ct., Cameron County, Tex. June 29, 1928). In this case, more than 275 descendants of Juan Jose Balli sued Gilbert Kerlin, individually and as trustee, as well as his wholly owned com-

panies, Windward Oil & Gas Corp. and PI Corp., asserting that Kerlin had defrauded them of oil and gas royalties and other interests in Padre Island. We hold that the Ballis' claims were not subject to statutory tolling and, accordingly, are time-barred. We therefore reverse and render judgment for the defendants.

## I. Background

In 1829 the State of Tamaulipas recognized the claims of Padre Nicolas Balli and his nephew, Juan Jose Balli, to what is now known as Padre Island. When Padre Nicolas died, his interest passed by devise to his seven nieces and nephews, including Juan Jose. In 1830, Padre Nicolas's heirs partitioned the island, leaving Juan Jose with the northern four-sevenths of the island and the other heirs with the southern three-sevenths. On the same day, Juan Jose conveyed his interest to Santiago Morales. Several months later, Morales and Juan Jose signed a rescission agreement after Morales became concerned about the clarity of Juan Jose's title. Despite the rescission agreement, however, Morales later mortgaged part of the property and conveyed the remaining portion of the property to Jose Maria Tovar. The rescission agreement, in large part, formed the basis for the Ballis'[1] claims in this suit to an existing interest in Padre Island. In the 1840s, the other Padre Nicolas heirs conveyed their interests in the southern half of the island to Nicolas Grisanti.

The court of appeals' opinion sets out in some detail the history of the Ballis' claims and the various suits over title to Padre Island. See 164 S.W.3d 892. For purposes of our discussion, however, suffice it to say that by the early 1900s the Ballis' interests in the island under Juan Jose Balli's title had largely disappeared, either through conveyances or adverse judgments, and a federal court had resolved various title disputes by awarding possession of the island to a number of parties. See Grisanti v. Am. Trust Co. of N.J., No. 18 (C.C.S.D.Tex. Nov. 16, 1905).

In 1923, Lizzie Havre filed a trespass to try title suit against three of the defendants who had been awarded possession in Grisanti: Pat F. Dunn, Sam A. Robertson, and W.E. Callahan. Dunn and the other defendants cross-claimed for title to and possession of all of Padre Island, except for the southernmost 7,500 acres. The Balli heirs were cited by publication, but did not appear. The district court ultimately granted title and possession of Padre Island, but for the southernmost 7,500 acres, to Sam A. Robertson and W.E. Callahan. Two of the cross-defendants timely filed a bill of review, which remained pending until the late 1930s.

In 1937, Gilbert Kerlin's uncle, Frederick Gilbert, was contacted by several people who had discovered evidence of an agreement to rescind the 1830 sale between Morales and Juan Jose Balli. Frederick Gilbert formed a partnership with them to pursue a claim to Juan Jose's interests in the island based upon the rescission agreement's existence. Gilbert put his nephew, a New York attorney, in charge of the venture, and Kerlin traveled to Brownsville to locate Juan Jose's heirs and purchase their interests. Kerlin contacted Primitivo Balli, the patriarch of the family, who agreed to assist him in securing all of Juan Jose's interests from the various heirs. Kerlin told the heirs that he was obtaining the deeds to clear title to Padre Island, and that each deed would reserve a 1/64th of 1/8th royalty in the grantor. The heirs allege Kerlin also assured them they would receive some compensation if he received anything through

---

**1.** We refer to Juan Jose Ballis' heirs collectively as "the Ballis."

the deeds. Kerlin, as trustee, obtained eleven general warranty deeds from the heirs, each containing a reserved royalty interest.

At some point, Kerlin and Gilbert decided to pursue other claims to Padre Island independent of their agreement with the persons who had uncovered the Morales rescission agreement, and they obtained a number of other titles that had been cut off by the *Havre v. Dunn* judgment. Kerlin sought to vindicate all of those claims by obtaining a new trial and pursuing a cross-action in *Havre v. Dunn.* His attorney, F.W. Seabury, filed the motion in the name of Kerlin, the heirs of Juan Jose, and two other *Havre v. Dunn* defendants. The Ballis were not informed of the pending cross-action, and Seabury never communicated with them about it.

On February 28, 1940, Kerlin, Gilbert, and Seabury met with the opposing parties to discuss settlement. During the meeting, Seabury argued that the deeds from the Balli grantors were valid and proposed that his "group" should receive forty percent of Padre Island. The case did not settle at that time, but in 1942, Seabury submitted a written settlement proposal under which the Kerlin interests would receive 25,542.6 acres. The proposal suggested that 7,444 acres comprised "acreage that was never divested out of Juan Jose Balli on any theory of the case."[2] The parties ultimately reached a settlement, and a hearing on the motion for new trial was set for November 9, 1942. Kerlin, who was serving in the army at the time, obtained a three-day pass to attend the hearing. At the hearing, a stipulation was filed under which Kerlin was to receive the mineral interests in 1,000 acres of Padre Island located in Nueces County and fee

simple title to 20,000 acres of land in the southern division of the island. During the three days he was in Texas, Kerlin, individually and in his capacity as trustee, executed reconveyance deeds to the Ballis. The Ballis were never informed of the deeds, nor were the deeds ever recorded or delivered. Kerlin also visited one of the Ballis, but he did not mention the *Havre v. Dunn* settlement.

Under the settlement stipulation, the parties were required to execute cross-conveyance deeds to each party's respective acreage. One of the parties to the settlement wrote to another that Seabury had agreed not to give the Ballis any recordable instrument that could cast a cloud on the parties' title, and Gilbert advised Seabury that the Ballis' interest would "die in Kerlin." After the settlement stipulation was executed, Seabury filed a motion to dismiss the Ballis' cross-action in *Havre v. Dunn.*

Some thirteen years later, in 1953, Primitivo Balli wrote two letters to Kerlin requesting documents showing his interest in Padre Island. Kerlin responded that he had received no title under the Ballis' deeds. He did not tell Primitivo Balli about the reconveyance deeds, or that *Havre v. Dunn* had been settled. The next year, Kerlin wrote Primitivo that he had been unable to establish that Juan Jose had not sold all of his interest in the island, and that his heirs consequently had no basis to claim any interest. Another eight years passed and, in 1961, Kerlin sold the 20,000–acre surface tract for more than $3.4 million. He also conveyed all of his mineral interests in the island to PI Corp., his wholly owned company. Another of Kerlin's wholly owned companies,

---

2. This contention was based not on the rescission agreement but upon an alternative theory that Juan Jose had only conveyed to Morales "one-half league" of the land he inherited and retained 7,444 acres for himself.

petitioner Windward Oil & Gas Corp., acquired one of Kerlin's partner's mineral interests in the island.

In 1985, some thirty-two years after Primitivo Balli's inquiry and twenty-four years after Kerlin sold his interest, Connie Sauceda, a descendant of one of the Balli grantors, contacted Kerlin to inquire about the mineral interests reserved in the Balli deeds. Kerlin told her that the deeds were invalid, and that she would have the burden of proof in an expensive, time-consuming lawsuit to prove otherwise.

Eight years later, in February 1993, some of the present Balli parties sued Kerlin, Windward, and PI Corp.[3] Ultimately, more than 275 other Balli heirs joined in the action. The Ballis alleged claims for breach of contract, breach of fiduciary duty, fraud, and conspiracy to commit fraud and breach of fiduciary duty. They sought damages, declaratory relief, the imposition of a constructive trust, and attorneys fees. Kerlin raised several affirmative defenses, including that the Ballis' claims were time barred by the statute of limitations and laches. After a two-month trial, the jury found that Kerlin was estopped from contesting the validity of the deeds executed by the Balli heirs; that the deeds reserved a 1/64 of a 1/8 royalty interest in the Ballis' favor; that Kerlin and PI Corp. breached fiduciary duties they owed the Ballis with respect to their reserved royalty interests; that Kerlin conspired with Seabury to commit fraud and breach the fiduciary duty Seabury owed the Ballis in settling *Havre v. Dunn;* and that Kerlin acquired 7,500 acres of land in his own name for the Ballis' benefit which he failed to share with them.

Regarding Kerlin's limitations defense and the Ballis' claim that his absence from the state tolled the statute's running, the jury found that Kerlin had not been present in the state for either a two- or four-year period between the date of the *Havre v. Dunn* settlement and the date this suit was filed. In addition, the jury found that Kerlin fraudulently concealed the facts and circumstances of the settlement and fraudulently concealed that he was receiving royalty payments that belonged to the Ballis. Finally, the jury found that Kerlin was not physically present in the state when wrongdoing occurred that formed the basis of the Ballis' claims.

Because some courts have held that limitations is not subject to statutory tolling unless a nonresident committed all or part of a contractual breach or tort here, the Ballis moved to set aside the latter finding, contending that Kerlin's presence in the state when wrongdoing occurred was established as a matter of law. *See, e.g., Howard v. Fiesta Tex. Show Park, Inc.,* 980 S.W.2d 716, 723 (Tex.App.-San Antonio 1998, pet. denied); *Wyatt v. Lowrance,* 900 S.W.2d 360, 362 (Tex.App.-Houston [14th Dist.] 1995, writ denied). The trial court granted the Ballis' motion. Based on the other jury findings, the trial court rendered judgment in the Ballis' favor for unpaid royalties, mineral lease rentals, and prejudgment interest and attorneys fees. The trial court imposed a constructive trust on an undivided 37.5% mineral interest, but denied the Ballis' request for an equitable accounting. The court of appeals affirmed except for the trial court's ruling denying an accounting, which it reversed and remanded to the trial court for further proceedings.[4] 164 S.W.3d at 903.

---

**3.** We generally refer to the defendants collectively as "Kerlin," although in some contexts we refer to Gilbert Kerlin individually.

**4.** After Kerlin's petition for review was filed, Kerlin and a group of plaintiffs who had reached a settlement filed a motion asking us to sever the equitable accounting claim and

We granted Kerlin's petition for review to consider the issues presented. 51 Tex. Sup.Ct. J. 445, 457–58 (Feb. 18, 2008). We begin with the threshold issues regarding limitations and fraudulent concealment, as their resolution is potentially dispositive of the parties' remaining claims.

## II. Limitation

■ Statutes of limitation operate to prevent the litigation of stale claims; they "afford plaintiffs what the legislature deems a reasonable time to present their claims and protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents or otherwise. The purpose of a statute of limitations is to establish a point of repose. . . ." *S.V. v. R. V.*, 933 S.W.2d 1, 3 (Tex.1996) (quoting *Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 828 (Tex.1990)). Kerlin contends the Ballis' breach of contract, fraud, and breach of fiduciary duty claims are barred by the four-year statute of limitations, and that the two-year statute bars their conspiracy claims. The Ballis maintain that the jury's fraudulent concealment findings and the tolling statute preclude the application of limitations in this instance. We first consider whether Kerlin's fraudulent concealment of the Ballis' entitlement to royalty payments and the details of the *Havre v. Dunn* settlement prevented limitations from running.

### A. Fraudulent Concealment

■ The jury found that Kerlin fraudulently concealed the fact that he was receiving royalty proceeds belonging to the Ballis, and that he fraudulently concealed the "facts, details, and circumstances" of the *Havre v. Dunn* settlement. Kerlin contends the jury's findings must be disregarded because, as a matter of law, the Ballis could have timely discovered the existence of their claims through the exercise of reasonable diligence. We agree.

■ A defendant's fraudulent concealment of wrongdoing may toll the running of limitations. *Shah v. Moss*, 67 S.W.3d 836, 841 (Tex.2001). Fraudulent concealment will not, however, bar limitations when the plaintiff discovers the wrong or could have discovered it through the exercise of reasonable diligence. *Id.; Velsicol Chem. Corp. v. Winograd*, 956 S.W.2d 529, 531 (Tex.1997); *Nichols v. Smith*, 507 S.W.2d 518, 519 (Tex.1974). In *HECI Exploration Co. v. Neel*, oil and gas royalty owners sued their lessee for failing to advise them of the lessee's successful suit against an adjoining operator for damages to the common field. 982 S.W.2d 881 (Tex. 1998). In evaluating the discovery rule's applicability to the royalty owners' claims, we noted that royalty owners are not entitled to "make[ ] no inquiry for years on end," and then sue for contractual breaches that could have been discovered within the limitations period through the exercise of reasonable diligence. *Id.* at 887–88. Because several sources of information are available to royalty owners about potential damage to their mineral resources, including their lessees, Railroad Commission records, and visible operations on adjoining property, we held that reasonable diligence would likely reveal any harm, and the discovery rule did not apply. *Id.* at 886–87. Like fraudulent concealment, the discovery rule does not apply to claims that could have been discovered through the exercise of reasonable diligence. While the discovery rule differs from fraudulent concealment in that its applica-

vacate that portion of the court of appeals' judgment. We granted that motion.

bility is determined on a categorical basis, *HECI* is nevertheless instructive in this case.

After the *Havre v. Dunn* settlement, Kerlin advised the Ballis that their claims were worthless. *Havre v. Dunn's* dismissal and Kerlin's receipt of more than 20,000 acres in fee simple and 1,000 mineral acres were matters of public record more than forty years before the Ballis filed this lawsuit. The Ballis were on notice that the warranty deeds their predecessors executed contained a royalty reservation, yet they never received any royalties. As a matter of law, the Ballis could have discovered the existence of any claims before limitations expired through the exercise of reasonable diligence. Consequently, unless statutory tolling applies, their claims are time barred.

## B. Statutory Tolling

■ Kerlin argues that the trial court erred in setting aside the jury's findings that he was not present in the state when any portion of the tortious acts occurred. Alternatively, he contends the tolling statute violates the Commerce Clause of the United States Constitution, art. I, § 8, cl. 3, to the extent that it applies to the claims against him, by forcing him either to consent to general jurisdiction in Texas or forego the benefits of statutes of limitation.[5] The Ballis respond that no evidence supported the jury's answers to the questions the trial court disregarded, and that the constitutional authority Kerlin cites is inapposite. Because we conclude that the tolling statute does not apply in these cir-

cumstances, we need not resolve either of those issues.

Section 16.063 of the Texas Civil Practice and Remedies Code provides that "[t]he absence from this state of a person against whom a cause of action may be maintained suspends the running of the applicable statute of limitations for the period of the person's absence." TEX. CIV. PRAC. & REM.CODE § 16.063. Thus, unless Kerlin was somehow present in the state for more than four years since the *Havre v. Dunn* settlement, limitations has not run on the Ballis' claims against him.[6]

A little more than forty years ago, in *Vaughn v. Deitz*, 430 S.W.2d 487 (Tex. 1968), we considered the interplay between the tolling statute's substantively equivalent precursor, former article 5537, and article 2039a, now codified at section 17.062 of the Civil Practice and Remedies Code, which permits substituted service on a nonresident involved in an automobile accident in this state by serving the chairman of the State Highway Commission. The narrow issue we decided was "whether Article 5537 ... applies in a case where substituted service of process is available under the provisions of Article 2039a." *Id.* at 488. We held that it did. *Id.*

Article 2039a provided that

[t]he acceptance by ... a person who was a resident of this State at the time of the accrual of a cause of action but who subsequently removes therefrom ... of the rights, privileges and benefits extended by law to such persons of oper-

---

**5.** The Attorney General has submitted an amicus brief contending that the statute does not violate the Commerce Clause, and urging us to decide the case on alternative grounds. *See Van Devender v. Woods*, 222 S.W.3d 430, 432 (Tex.2007) ("Judicial restraint cautions that when a case may be decided on a nonconstitutional ground, we should rest our de-

cision on that ground and not wade into ancillary constitutional questions.").

**6.** The tolling statute plainly does not apply to the corporate defendants, Windward Oil & Gas Corp. and PI Corp., as it is undisputed that these Texas corporations have never been absent from the state.

ating a motor vehicle ... within the State of Texas shall be deemed equivalent to an appointment by such nonresident ... of the Chairman of the State Highway Commission of this State ... to be his true and lawful attorney and agent upon whom may be served all lawful process in any civil action or proceeding ... hereafter instituted against said nonresident ... growing out of any accident, or collision in which said nonresident ... may be involved while operating a motor vehicle ... within this State, ... and said acceptance or operation shall be a signification of the agreement of said nonresident ... that any such process against him ... served upon said Chairman of the State Highway Commission ... shall be of the same legal force and validity as if served personally.

Act of May 8, 1959, 56th Leg., R.S., ch. 502, § 1, 1959 Tex. Gen. Laws 1103, 1103–04 (codified at TEX. CIV. PRAC. & REM.CODE § 17.062). Article 2039a thus created a binding legal presumption that nonresidents, by driving on Texas roadways, had appointed the chairman of the State Highway Commission their agent for service of process in lawsuits arising from motor vehicle accidents within the state. We concluded that article 5537, section 16.063's precursor, "refer[red] to the absence of the defendant from or presence within the territorial limits of the state," and the availability of substituted service on the Highway Commission chairman was irrelevant to that inquiry. *Deitz,* 430 S.W.2d at 490. Accordingly, limitations was tolled during the driver's absence. *Id.*

We did not consider the effect of the general longarm statute in *Deitz.* Just as article 2039a deemed the Highway Commission chairman the agent for service of process for nonresident motorists in suits stemming from in-state accidents, the general longarm statute provides that "the secretary of state is an agent for service of process on a nonresident who engages in business in this state ... in any proceeding that arises out of the business done in this state...." TEX. CIV. PRAC. & REM.CODE § 17.044(b). But unlike article 2039a, in addition to providing for substituted service, the general longarm statute specifically addresses a nonresident defendant's presence within the state's territorial limits for purposes of personal jurisdiction; specifically, the statute provides that a nonresident does business "in this state" if, among other acts, the nonresident contracts with a Texas resident and either party is to perform in whole or in part here, or the nonresident commits a tort in whole or in part in this state. TEX. CIV. PRAC. & REM.CODE § 17.042. Of course, the longarm statute only affords in personam jurisdiction if "jurisdiction accords with federal due-process limitations." *Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 575 (Tex.2007) (citing *Am. Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 806 (Tex.2002); *CSR Ltd. v. Link,* 925 S.W.2d 591, 594 (Tex.1996); *Schlobohm v. Schapiro,* 784 S.W.2d 355, 357 (Tex.1990)). But if a nonresident is amenable to service of process under the longarm statute and has contacts with the state sufficient to afford personal jurisdiction, as was the case with Kerlin, then we can discern no reason why a nonresident's "presence" in this state would not be established for purposes of the tolling statute.

In this case, the jury found that Kerlin was receiving royalty payments that rightfully belonged to the Ballis from January 1, 1966, until February 8, 1991, and that he continued to deceive the Ballis about the *Havre v. Dunn* settlement from its execution until the same date. Thus, whether or not Kerlin was constructively present in Texas because he was subject to service of

process via the secretary of state, he was present by doing business in this state as the statute defines that term. Because Kerlin was doing business here and was thus not absent from Texas, the tolling statute does not apply and limitations bars the Ballis' claims. Because the Ballis' claims are time barred, we need not address Kerlin's other arguments.

### III. Conclusion

The record conclusively establishes that the Ballis could have discovered Kerlin's wrongful conduct through the exercise of reasonable diligence. In addition, the statute of limitations was not tolled because, under the general longarm statute, Kerlin was present in the state. Accordingly, the statute of limitations bars the Ballis' claims. We reverse the court of appeals' judgment and render judgment for Kerlin.

Justice BRISTER filed a concurring opinion, in which Justice HECHT, Justice MEDINA, and Justice WILLETT joined.

Justice BRISTER, joined by Justice HECHT, Justice MEDINA, and Justice WILLETT, concurring.

I concur in the Court's judgment. I understand the Court's reluctance to overrule one of our cases, but 40 years ago Justices Pope, Greenhill, and Steakley were right that *Vaughn v. Deitz* was wrongly decided.[1] Our "absent from the state" statute arose in 1841, a long time before minimum-contacts analysis did; as

almost every other state has decided, a person whose minimum contacts make them amenable to suit in a state cannot fairly be said to be "absent from the state."[2] Indeed, such a construction would face serious constitutional problems.[3]

It is unclear why the Court is afraid to say so. No one has argued that we should distinguish rather than overrule *Vaughn* for a very good reason: it is impossible. Both the long-arm business statute here and the long-arm motorist statute in *Vaughn* are part of the same chapter in the Civil Practices and Remedies Code, and both make nonresidents amenable to suit in Texas. Indeed, one can sue a nonresident motorist under either: as a party to a collision,[4] or as one who has conducted business by "commit[ting] a tort in whole or in part in this state."[5] Does the Court mean to say today that limitations is tolled under this Code's section 16.063 if the plaintiff serves the Secretary of State,[6] but not if the plaintiff serves the Transportation Commission Chairman?[7]

But the court of appeals' opinion also purports to say a lot about several other legal doctrines (there are 95 headnotes in the Southwestern Reporter), some of which we have not addressed in a very long time, and every one of which the court of appeals misapplied. If experienced judges can make such mistakes, others may follow and the jurisprudence of

1. 430 S.W.2d 487, 491 (Tex.1968) ("The Texas tolling statute ... is not unique or different from those of other states, almost all of which have held that the presence or absence of a defendant must be solved in terms of jurisdiction over the person.") (Pope, J., dissenting).

2. *Id.*

3. *See Bendix Autolite Corp. v. Midwesco Enters., Inc.,* 486 U.S. 888, 891–93, 108 S.Ct. 2218, 100 L.Ed.2d 896 (1988) (holding states

cannot condition limitations statutes on requirement that nonresidents appoint a local agent for service).

4. Tex. Civ. Prac. & Rem.Code § 17.062(a).

5. *Id.* § 17.042(2).

6. *See id.* § 17.044(a).

7. *See id.* § 17.062(a).

the state become disoriented.[8] I would straighten a few of these out.

The primary mistake made by the courts below was forgetting that the transaction on which this suit is based was a *sale*. The heirs of Juan Jose Balli (nephew of the Roman Catholic priest after whom Padre Island is named) sold any interest they might have in that island in 1938 to Gilbert Kerlin in 11 duly recorded quitclaim deeds,[9] retaining only a 1/512th interest[10] in any minerals:

> KNOW ALL MEN BY THESE PRESENTS that the undersigned, [each of the Balli heirs], for and in consideration of the sum of $10.00 cash in hand to us paid by Gilbert Kerlin, trustee ... and other valuable considerations, the receipt of all of which is hereby acknowledged and confessed, have GRANTED, SOLD AND CONVEYED and by these presents do GRANT, SELL AND CONVEY, unto the said Gilbert Kerlin, trustee, all of our undivided interest in and to all that certain tract of land situated in the counties of Cameron, Willacy, Kenedy, Kleberg and Nueces, in the State of Texas, commonly known as PADRE ISLAND.... It being our intention to convey all the interest which we have in the hereinabove described premises, and each and every part thereof, by

reason of our being the lawful heirs of the said Juan Jose Balli, irrespective of the acreage or quantity thereof, save and except that there is specifically reserved to us a one-sixty-fourth (1/64th) of the royalty of one-eighth (1/8th) of any and all oil and/or gas or other minerals in, on or under our pro rata interest in the above described premises.

Keeping this simple fact in mind, all of the Plaintiffs' claims—and the 15 years of litigation that have followed—collapse in a heap.

### The Heirs Had Nothing to Sell

Juan Jose Balli sold his interests in Padre Island to Santiago Morales in 1830. This Court so held in 1944 in *State v. Balli*.[11] Balli's heirs have never lived on Padre Island, never worked it, never paid taxes on it. Their sole claim to title—that Balli and Morales rescinded their sale—was rejected by this Court in *State v. Balli*.[12]

But even assuming that holding was not binding on these heirs, any claim the heirs had to Padre Island was extinguished by a default judgment in 1928 in *Havre v. Dunn*. There, all Balli heirs known and unknown (the ancestors and privies of all current claimants) were served by publication in a case regarding title to these parts

---

8.  *See* Tex. Gov't Code § 22.001(a)(6) ("The supreme court has appellate jurisdiction ... extending to all questions of law arising in ... any other case in which it appears that an error of law has been committed by the court of appeals, and that error is of such importance to the jurisprudence of the state that, in the opinion of the supreme court, it requires correction, but excluding those cases in which the jurisdiction of the court of appeals is made final by statute.").

9.  Apparently 12 deeds were signed but only 11 were recorded as one appeared to be a duplicate. *See* 164 S.W.3d 892, 905.

10. The deeds reserve "a one-sixty-fourth (1/64th) of the royalty of one-eighth (1/8th) of any and all oil and/or gas or other minerals ...," yielding a 1/512th royalty interest.

11. *See* 144 Tex. 195, 190 S.W.2d 71, 81 (1944) ("On January 19, 1830, Juan Jose Balli ... conveyed to Santiago Morales his original one-half of Padre Island, together with one-half league more that he had acquired by inheritance from his uncle, the Priest Nicolas Balli.").

12. *Id.* at 87 ("It may be inferred from these proceedings that Balli cleared his title to the satisfaction of Morales.").

of Padre Island. When none of the Balli heirs appeared, all were defaulted. One non-Balli claimant filed a motion for new trial within the two-year period for setting aside a default served by publication,[13] but none of the Balli heirs did. Thus any interest the heirs held in Padre Island was extinguished in 1928, ten years before they met Gilbert Kerlin.

### Estoppel By Deed Does Not Apply

The courts below disregarded these facts based on an "estoppel by deed"—that because Kerlin bought quitclaim deeds from the heirs and used them in the hope of gaining something thereby, he was estopped to claim that they conveyed him nothing.[14] While we have not written much about estoppel by deed in a long time, the 2003 RESTATEMENT (THIRD) OF PROPERTY describes at least two reasons why estoppel by deed has nothing to do with this case:

> Under the doctrine of estoppel by deed, a purported transfer of land that the transferor does not own becomes en-

forceable and takes place automatically if the land is later acquired, but only if the deed represents to the grantee that title of a specified quality is being conveyed, which most warranty deeds but few quitclaim deeds do.[15]

This case does not involve after-acquired title, no Balli heir having bought or inherited any part of Padre Island in over 170 years. Even if they had, the quitclaim deeds they gave Kerlin did not warrant title, so estoppel by deed could never apply.[16]

Relying on a court of civil appeals case from 1892, the court of appeals extended estoppel by deed to the much broader proposition that " 'all parties to a deed are bound by the recitals therein.' " [17] But even assuming that is true, the heirs' deeds contained no recitals of ownership or title; they were mere quitclaims.[18] While the deeds reserved a 1/5 12th royalty, Kerlin never denied that reservation; he was trying to deny that the heirs had any interest to convey *before* the reservation, a

---

13. *See* TEX.R. CIV. P. 329(a).

14. 164 S.W.3d at 915–16.

15. RESTATEMENT (THIRD) OF PROPERTY: WILLS & OTHER DONATIVE TRANSFERS § 6.1, comt. f (2003).

16. *See Houston First Am. Sav. v. Musick,* 650 S.W.2d 764, 770 (Tex.1983) ("[W]hen one conveys land by warranty of title, or in such a manner as to be estopped to dispute the title of his grantee, a title subsequently acquired to that land will pass *eo instante* to his warrantee, binding both the warrantor and his heirs and subsequent purchasers from either."); *Robinson v. Douthit,* 64 Tex. 101, 105 (1885) (finding estoppel by deed because donor's deed was "neither in form nor substance a mere quitclaim"); *see also* RESTATEMENT(FIRST) OF PROPERTY §§ 166, 167 (noting that "a quitclaim deed ... affords no foundation for either an estoppel by deed or an equitable transfer"); 1 H. WILLIAMS & C. MEYERS, OIL AND GAS LAW § 311. 1, at 583–84 (noting estoppel by deed is likely inapplicable to a quitclaim);

M. Benjamin Cowan, *Venue for Offshore Environmental Crimes: The Seaward Limits of the Federal Judicial Districts,* 49 VAND. L.REV. 825, 856 n. 165 (1996) ("Quitclaim deeds by definition contain no warranties of title, and as such are categorically excepted from the doctrine of estoppel by deed."); Lawrence W. Waggoner, *Reformulating the Structure of Estates: A Proposal for Legislative Action,* 85 HARV. L.REV. 729, 745 n. 52 (1972) ("[E]stoppel by deed is invoked in law when there is an attempted transfer by warranty deed.").

17. 164 S.W.3d at 915 (quoting *Wallace v. Pruitt,* 1 Tex.Civ.App. 231, 20 S.W. 728, 728–29 (Tex.Civ.App.-Corpus Christi 1892, no writ)).

18. *See Geodyne Energy Income Prod. P'ship I–E v. Newton Corp.,* 161 S.W.3d 482, 486 (Tex. 2005) ("A warranty deed to land conveys property; a quitclaim deed conveys the grantor's rights in that property, if any.").

matter as to which the quitclaim deeds were silent. As nothing about Kerlin's claim was inconsistent with the deeds, the courts below erred in holding they created title in the heirs.

## The Heirs' Royalty Claim Is Against Someone Else

But even assuming all this could be ignored and the heirs held a 1/512th royalty, they have sued the wrong man. The heirs' claim for royalties lies against the operators who have been producing minerals from those properties since 1938. That was not Kerlin; he released any interest he had in those same properties in 1942. The lands Kerlin got in the 1942 settlement were in southern Padre Island and Nueces County—lands Juan Jose Balli never even arguably owned. The heirs' tiny royalty interest did not follow Kerlin wherever he went; if the heirs have a royalty claim, it is against someone else.

## The Settlement Did Not Affect the Heirs' Claims

But even assuming the heirs had some interest to claim against Kerlin, Kerlin's 1942 settlement in *Havre v. Dunn* did not touch it. "In order to effectively release a claim in Texas, the releasing instrument must 'mention' the claim to be released." [19] Kerlin released a number of claims he had bought from others in the *Havre v. Dunn* settlement, but the settlement documents make no mention of releasing claims arising through the Balli heirs.

The heirs' only evidence that the settlement involved their claim is an unaccepted settlement demand sent by Kerlin's attorney, F.W. Seabury, asking for 7,500 acres "[f]or the Juan Jose interest." But that wasn't for the heirs—Kerlin had *bought* the "Juan Jose interest" for himself, the heirs retaining only a tiny royalty. Moreover, a settlement offer in Texas courts is "not admissible to prove liability for or invalidity of [a] claim or its amount." [20] The court of appeals held Kerlin had waived this objection by testifying about the offer after it was admitted; [21] but since the trial court had granted him a running objection, he "was entitled to defend [him]self by explaining, rebutting, or demonstrating the untruthfulness of the objectionable evidence without waiving [his] objection." [22] As a matter of law, Kerlin got nothing for the heirs' claims in the settlement documents, and there is no evidence otherwise.

The heirs gained nothing from the settlement of *Havre v. Dunn* because they never appeared or made any claims in the case. The claims Kerlin made were his own, which he had bought and owned outright; he could neither have made nor settled the heirs' tiny mineral claim *because he did not own it.*

## Kerlin Was Not the Heirs' Fiduciary

Like any other buyer, Kerlin owed his sellers (the heirs) no fiduciary duty after buying their interests.[23] The court of appeals located a fiduciary duty in the duty a holder of executive rights owes to royalty

---

19. *Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931, 938 (Tex.1991).

20. TEX.R. EVID. 408.

21. 164 S.W.3d at 920.

22. *Scurlock Oil Co. v. Smithwick,* 724 S.W.2d 1, 4 (Tex.1986).

23. *See Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 177 (Tex.1997) ("[T]o impose [a fiduciary] relationship in a business transaction, the relationship must exist prior to, and apart from, the agreement made the basis of the suit.").

owners.[24] But this duty is limited to benefits that accrue from a mineral *lease,* not a *sale;*[25] as Texas law has long recognized, leasing minerals imposes duties that selling them does not.[26] Texas law has never required an owner who is selling a mineral interest to negotiate a sales price for royalty owners who are *not* selling. The court of appeals inexplicably held that Kerlin violated a fiduciary duty by not giving the Ballis some of what he got from selling his own interest rather than theirs. There is no such duty.

### Having Your Own Attorney is not a Conspiracy

Nor could Kerlin be liable for conspiring with Seabury, his own attorney, to commit fraud or breach the latter's fiduciary duty to the heirs *because the heirs were never Seabury's clients.* It is undisputed Seabury never met or spoke with any of the Balli heirs; how exactly could he have become their attorney? And if he was not their attorney, how exactly could failing to disclose something to them be fraud or breach a fiduciary duty? It is true that Seabury filed an answer in *Havre v. Dunn* in the name of each of the heirs, but it has long been the rule that an assignee (Kerlin) can sue in the name of his assignors (the heirs).[27] Because the heirs had been named and served by publication in *Havre v. Dunn,* it was perfectly proper for Seabury's bill of review seeking to reopen that suit to be filed in their names, even though the title claims (if any) now belonged to Kerlin. As Seabury was not the heirs' attorney, he owed them no fiduciary duty or duty to disclose anything that occurred.

### Conclusion

Recent years have seen a number of suits in South Texas seeking to reopen title claims to lands that have been dormant for decades or centuries.[28] The court of appeals' opinion here will go a long way toward encouraging such suits, should someone make the mistake of considering it a correct statement of Texas law. I would disabuse them of that notion.

**24.** 164 S.W.3d at 916; *see Manges v. Guerra,* 673 S.W.2d 180, 183 (Tex.1984) ("[T]he duty of the executive … requires the holder of the executive right … to acquire for the nonexecutive every benefit that he exacts for himself."); *Schlittler v. Smith,* 128 Tex. 628, 101 S.W.2d 543, 545 (1937).

**25.** *In re Bass,* 113 S.W.3d 735, 744 (Tex. 2003).

**26.** *See HECI Exploration Co. v. Neel,* 982 S.W.2d 881, 889 (Tex.1998) (citing *Danciger Oil & Ref. Co. of Tex. v. Powell,* 137 Tex. 484, 154 S.W.2d 632, 635 (1941)) ("The decision in *Danciger* drew a distinction between oil and gas *leases* and *conveyances* with a reservation of mineral interests. The obvious purpose of a mineral lease is for the lessee to conduct exploration and drilling within a defined period of time. That is not the case with conveyances of mineral interests." (citation omitted)).

**27.** *Tex. Mach. & Equip. Co. v. Gordon Knox Oil & Exploration Co.,* 442 S.W.2d 315, 316 (Tex.1969).

**28.** *See, e.g., King Ranch, Inc. v. Chapman,* 118 S.W.3d 742 (Tex.2003); *Aguillera v. John G. and Marie Stella Kenedy Mem'l Found.,* 162 S.W.3d 689, 692 (Tex.App.-Corpus Christi 2005, pet. denied).