**SHELL OIL COMPANY and SWEPI LP d/b/a Shell Western E & P, Successor in Interest to Shell Western E & P, Inc., Appellants,**

v.

**Ralph ROSS, Appellee.**

**No. 01–08–00713–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Feb. 25, 2010.

Rehearing Overruled April 23, 2010.

---

Daniel C. Miller, Austin, TX, Lisa L. Silvestri, Gable & Gatwals, Tulsa, OK, for Appellants.

David Scott, Georgetown, TX, Mark L. Perlmutter, Perlmutter & Schuelke, L.L.P., Austin, TX, for Appellee.

Panel consists of Justices JENNINGS, ALCALA, and HIGLEY.

## OPINION

TERRY JENNINGS, Justice.

Appellants, Shell Oil Company ("Shell Oil") and Shell Western E & P ("Shell Western") (collectively "Shell"), challenge the trial court's judgment, entered after a jury trial, in favor of appellee, Ralph Ross, in Ross's suit against Shell for breach of contract, unjust enrichment, and fraud concerning the underpayment of oil and gas royalties to Ross's grandmother, Gertrude T. Reuss. Shell presents six issues for our review. In its fourth issue, Shell contends that the trial court erred in entering judgment and denying Shell's motion for judgment notwithstanding the verdict in which Shell asserted that it properly used a "weighted average price" in calculating the royalty payments it made to Ross and his predecessors (collectively "the Rosses"). In its first, second, third, and fifth issues, Shell contends that the trial court erred in denying its motions for directed verdict and for judgment notwithstanding the verdict in which Shell asserted that the evidence is legally

insufficient to support the jury's finding that Shell fraudulently concealed its underpayment of royalties to the Rosses and the jury's findings on when the Rosses should have discovered Shell's underpayment of royalties. In its sixth issue, Shell contends that the trial court erred in not including Shell's proposed instruction on constructive notice in the jury charge.

We affirm.

### Factual and Procedural Background

In his fifth amended petition, Ross alleged that he is the "current owner of one-third of the mineral interests reserved" in the Oil, Gas and Mineral Lease that Shell Oil and G.T. Reuss and Gertrude T. Reuss entered into on August 22, 1961 (the "Reuss Lease"). Ross claimed that Shell is "expressly obligated under the [Reuss] Lease to pay . . . an undivided 1/8 royalty, valued in accordance with the royalty provisions, . . . [which state that the] valuation of the royalty on unprocessed gas is based on '. . . the amounts realized . . .' from sales of the gas." Because Shell "failed to pay royalty in accordance with the express royalty provisions and covenant of the [Reuss] Lease," Shell "breached the express obligations under the lease." Ross also claimed that Shell "created a fraudulent scheme to deprive [Ross] of royalties" by paying royalties "based on an arbitrary amount even below the internal transfer price." Shell "concealed this scheme by sending statements with [Ross's] royalty checks that contained false representations that the royalties were based on the actual sales prices."

At trial, Bryan Garrison, who managed Shell's royalty payment obligations from "1995 to around 2000," testified that Shell Oil "originally assumed the obligations to pay royalties under the [Reuss Lease]." Garrison agreed that, under the Reuss Lease, Shell was obligated to pay, as a royalty, one-eighth of the market value of the natural gas realized at the mouth of the well. Shell divided this one-eighth royalty payment between the Reusses and the State of Texas, so Shell was ultimately obligated to pay the Reusses "1/16th of the amount realized at the mouth of the well." Garrison explained that under the Reuss lease, Shell is required to calculate and pay the royalty based upon the sale price of the natural gas.

Garrison noted that in making royalty payments to the State of Texas, Shell reported the sale price of the natural gas to the Texas General Land Office ("Land Office"), where "you can look at the records." However, he conceded that the actual receipts were in Shell's possession and not publicly available and the "amount paid to the State can very well be quite different than . . . what the Reuss landowners were entitled to."

Garrison further testified that in 1970, Shell entered into the Lasater pooling agreement with Forest Oil. Under the pooling agreement, Shell and Forest Oil allocated the natural gas produced from a well on the Lasater's property based on the amount of land that they contributed to the agreement. Based on the share of land that Shell contributed,[1] it received 62.5% of the natural gas produced by the Lasater well. Thus, as per Garrison, if the Lasater well produced 10,000 mcf[2] of natural gas, Shell received 6,250 mcf of natural gas and Forest Oil received 3,750 mcf.

---

1. Shell contributed a total of 400 acres to the Lasater tract, 240 acres from the Reuss tract and 160 from the Lasater tract. Forest Oil contributed 240 acres of land that it had leased.

2. One "mcf" of natural gas equals 1,000 cubic feet of natural gas.

Garrison explained that in order to calculate the royalty payments on gas produced from the Lasater well, Shell did not use the price that it realized from selling the natural gas. Instead, Shell used a "weighted average price," which it calculated by weighting its sale price and Forest Oil's sale price, according to their respective shares of gas, and then averaging these weighted prices. For example, if the Lasater well produced 10,000 mcf of natural gas and Shell sold its share of the natural gas for $1.20 per mcf and Forest Oil sold its share of the natural gas for $.90 per mcf, then Shell would "weight the average" by giving "the $1.20 price the weight of 6,250" and "the 90–cent price a weight of 3,750." Thus, Shell would have paid royalties to the Rosses based on a price closer to "90 cents than $1.20." Shell stipulated that from January 1988 through February 1997, Shell had paid the Rosses approximately $60,000 less by using the weighted average price than if Shell had used its sale price. Garrison agreed that the Reuss Lease does not state that "Shell can pay Ms. Reuss based on a weighted average or blended price."

In 1983, Shell Oil formed Shell Western and transferred a number of active oil and gas leases, including the Reuss Lease, to Shell Western, which assumed all obligations under the leases.

In October 1995, Shell sent a letter to 2,246 royalty owners in Texas with an enclosed check. In the letter, Shell stated that it had enclosed the check as "an adjusted calculation for the period from September, 1986 through August, 1995." Shell also stated that it had made this "retroactive adjustment as a result of disputes that [had] arisen with a few of [its] royalty owners" because Shell had been calculating royalties based on the transfer price to Shell Gas Trading Company ("SGT") instead of the price Shell actually realized from its sale to a third party. Shell further stated that the check amount reflected "the difference between index prices and the net prices [SGT] received from third parties, plus interest." However, Garrison explained that the "letter did not disclose ... that [Shell] had not in the past even been paying the transfer price."

Shell also indicated in the letter that "future royalty payment calculations [would] be based upon the net prices the new venture receives from third parties for the gas." Garrison explained this to mean that, according to the letter, future royalty calculations would be based on what Shell "sold the gas for in an arm's-length sale." However, Garrison conceded that, after sending this letter, Shell continued to pay royalties based on an amount that was less than "the transfer price, [and] much less [than] the third-party sale price, despite the representation in this letter." Garrison did not discover this underpayment until after his first deposition. He had understood that a letter had been sent to Shell's accounting department with "specific instructions on how to pay the royalty owners" in accordance with the October 1995 letter.

Garrison further testified that if any of the Rosses had called Shell with questions about the methods used to calculate their royalties, Shell would have provided them with "information, pricing, volumes, and value." He had reviewed his telephone call log and "found no evidence that anybody had called concerning [the Rosses]."

Robert Bridges, a Shell employee, testified that he supervised his staff in setting the transfer price of natural gas sold by Shell Western. In setting the transfer price, he attempted to "protect the Shell house with a very clear, transparent methodology of pricing that would be fair." Bridges agreed that in protecting the "Shell house," he was both "representing

[Shell Western], the [Shell] affiliate; and ... representing the purchaser, [SGT]." He also agreed that the transfer price was unrelated to "what the gas was actually sold for by SGT."

Ross's father, Ralph Louis Ross, the son of G.T. Reuss and Gertrude T. Reuss, testified that he administered his mother's oil and gas interests beginning in 1980. Ross's father did not learn that Shell had been underpaying the royalties due under the Reuss Lease until sometime in 2002, when David Scott, an attorney who had formerly been employed by the Land Office, informed him that the Land Office had received a settlement from Shell based on underpayment of royalties on natural gas produced from the Reuss tract. When he learned of the underpayment, Ross's father assigned "all legal rights that the estate had," including the rights to pursue a lawsuit against Shell, to Ross. The royalty statements sent by Shell included the unit price of the natural gas, which Ross's father understood to be the price that Shell received from selling the gas to a third party. Ross's father explained that he did not remember receiving the October 1995 letter from Shell.

Charles Graham, Ross's expert witness, testified that under the Reuss Lease, Shell should have made royalty payments based on the price that Shell "actually sold the gas for." He explained that the Rosses would not have known that their royalty payments were incorrect even had they known that the Land Office's royalty payments differed from the Rosses' payments because the Land Office is "free to negotiate a different royalty obligation with Shell." The only documents which indicated to Graham that the Rosses had been underpaid were Shell and El Paso Natural Gas internal documents, which were not publicly available. Graham noted that the published gas price index is an estimated

value of gas prices on average during a period of time and would not reflect the selling price that Shell actually received for its gas.

Graham further testified that from 1994 through 1997, Shell had used an arbitrary price to calculate the Reusses' royalty payments. He calculated that this resulted in an underpayment of $10,000.78. Additionally, Shell had improperly used a weighted average price to calculate the Reusses' royalty payments from 1988 through 1997 for the Lasater and Houston wells. Graham calculated that this had resulted in an underpayment of $62,531.31.

John Berghammer, Shell's expert witness, testified that Shell's use of a "weighted average/blended price" calculation "was appropriate, and also ... completely consistent with ... industry practice for the same sort of an accounting situation involving unit or pooled-type production." He explained that some oil and gas publications collect price information and set an index, which can be used to approximate the price of gas in an area. Also, the El Paso Permian Basin Index, published privately, is commonly used in the area of the Reuss tract. When Berghammer compared the price used to calculate the Rosses' royalty payments and compared that price to the index, he determined that the unit price on the royalty statements from 1988 to 1993 was "obviously" much lower than the index price.

Before presenting their closing arguments to the jury, the parties provided the trial court with stipulations regarding damages calculations. They stipulated that if limitations did not bar Ross's claims, his damages were at least $10,000.78 based on the underpayment of royalties. The parties further stipulated that if Shell's use of a weighted average price in calculating royalties had breached

the Reuss Lease, then Ross's damages were $72,532.09, plus interest.

The trial court found, as a matter of law, that Shell had "breached the contract with [Ross] as it relates to the 'weighted average/blended price' issue." The jury found that Shell had fraudulently concealed its "fail[ure] to pay royalties between 1994 and 1997 for reasons other than the 'weighted average/blended price' issue" and that the Rosses should have discovered this underpayment, in the exercise of reasonable diligence, in "2002." The jury also found that Shell had fraudulently concealed its "fail[ure] to pay royalties between 1988 and April 1994 because of the 'weighted average/blended price' issue" and the Rosses should have discovered this underpayment, in the exercise of reasonable diligence on "Feb. 6, 2006."

Based on the jury's fraudulent concealment findings, the trial court ordered that Ross recover actual damages of $72,532.09, prejudgment interest, attorneys' fees, and court costs.

### Weighted Average Calculation of Royalty Payments

In its fourth issue, Shell argues that the trial court erred in concluding that Shell breached the Reuss Lease by using a weighted average royalty calculation[3] because paragraph 13 of the Reuss Lease indicates that the royalty payments should be calculated based on the sale price of the natural gas sold by Shell and any other working interest owners.

■ When a written contract is not ambiguous, the trial court should interpret the contract as a question of law. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 650–51 (Tex.1999). We review the trial court's legal conclusions de novo. *Id.* Here, the parties do not contend that the contract is ambiguous, nor do they dispute the relevant facts. The parties have stipulated that if Shell's use of a weighted average royalty calculation violates the Reuss Lease then it underpaid the Reusses by $72,532.09.

■ Paragraph 13(a) of the Reuss Lease allows Shell to "pool or unitize all or any part of [the Reusses'] land." In 1968, Shell entered into a pooling and unitization agreement with Marathon Oil and Forest Oil, under which it pooled 320 acres of the Reuss tract into the Houston Unit. Then, in 1970, Shell entered into another pooling and unitization agreement with Forest Oil, under which it pooled 240 acres of the Reuss tract into the Lasater Unit.

For both the Houston and Lasater wells, Shell received its share of the natural gas produced, based on the amount of land it contributed to the pooled unit, and sold the gas to third parties. For example, Shell received 62.5% of the natural gas produced by the Lasater well because it had contributed 62.5% of the land to the Lasater Unit. When Shell calculated the royalty payment due to the Reusses, it did not calculate the royalty payment based on the price that Shell received for the gas. Instead, Shell calculated the weighted average price of all the gas produced at the mouth of the well by averaging the sale price that it had received with the sale prices that any other working interest owners, e.g., Forest Oil, had received. Before averaging the sale prices, Shell first weighted the working interest owner's sale prices based on their respective shares of the natural gas.

Shell argues that paragraph 13(b) of the Reuss Lease demonstrates that its weight-

---

3. Shell does not dispute that it breached the lease by underpaying royalties for the other reasons identified by the Rosses.

ed average calculation of the unit price is permitted because this "provision does not say that it was only that portion produced and sold by [Shell Western]; in fact, the implication is that it is the defined portion of all of the production, including that sold by the other working interest owners."

Paragraph 13(b) controls the allocation of natural gas to the Reuss tract when included in a larger, unitized tract of land:

> Any operations conducted on any part of such unitized land shall be considered, for all purposes, except for the payment of royalty, operations conducted under this lease. *There shall be allocated to* the land covered by the lease included in any such unit *that proportion of the total production of unitized minerals from wells in the unit,* after deducting any used for lease or unit operations, *which the number of surface acres in the land covered by this lease included in the unit bears to the total number of surface acres in the unit.* The production so allocated shall be considered for all purposes, including the *payment or delivery of royalty,* overriding royalty, and any other payments out of production, to be the entire production of unitized minerals from the portion of said land covered hereby and included in such unit *in the same manner as though produced from said land under the terms of this lease.*

(Emphasis added.) This provision requires that Shell pay the Reusses' royalty based on the production of natural gas allocated to the Reuss tract. The provision further provides that the amount of natural gas allocated to the Reuss tract should represent the percentage of the natural gas produced that corresponds to the percentage of "the total number of surface acres in the unit" contributed by the Reuss tract. However, nothing in this provision addresses how the natural gas, so allocated, should be valued for purposes of royalty payments. Instead, the provision states that royalty payments should be made "in the same manner as though produced from said land under the terms of this lease."

Under paragraph 4 of the Reuss Lease, Shell agreed to pay royalties to the Rosses,

> . . . on gas and casinghead gas produced from [the Reuss tract] (1) when sold by [Shell], one-eighth of the amount realized by [Shell] computed at the mouth of the well, or (2) when used by [Shell] off said land or in the manufacture of gasoline or other products, the market value, at the mouth of the well, of one-eighth of such gas and casinghead gas."

Shell argues that the royalty payment should be calculated based on the amount realized by all the working interest owners who are part of the pooling and unitization agreement because each working interest owner received a portion of the natural gas "produced from" the Reuss tract. However, the Reuss Lease expressly requires Shell to calculate royalty payments based on the amount realized by Shell. It does not contain any language that would allow Shell to calculate royalty payments based on the amount realized by any other working interest owner. In using a weighted average calculation, Shell, to its benefit, calculated the Reusses' royalty payments in a manner that contradicts the express language of the contract.

Due to the fluid character of natural gas, the working interest owners could not divide the gas among themselves based on which contributing tract produced the gas. Instead, they decided to allocate the gas in proportion to the percentage of land contributed by that working interest owner. Similarly, paragraph 13(b) of the Reuss Lease allocates the gas on which Shell pays a royalty to the Reusses in proportion to the percentage of land contributed

by the Reuss tract. Although the natural gas that Shell received from the unitized tract could not be identified specifically and uniquely with production from the Reuss tract, the amount of natural gas allocated to Shell from the unitized tract is directly proportional to the amount of land it contributed to the unitized tract. Therefore, in the context of the Reuss Lease and this pooling and unitization agreement, the natural gas that Shell sold was produced from the Reuss tract.

By calculating the Reusses' royalties based on a weighted average price, Shell breached its contract by paying royalties on a price less than the amount that Shell realized from the sale of the gas. Accordingly, we hold that the trial court did not err in concluding that Shell breached its contract with the Reusses by paying royalties based on a weighted average price.

We overrule Shell's fourth issue.

### Fraudulent Concealment

In its first and second issues, Shell argues that the trial court erred in denying its motions for a directed verdict and for judgment notwithstanding the verdict because the evidence is legally insufficient to show that Shell fraudulently concealed its underpayment of royalties to the Rosses.

We will sustain a legal sufficiency or "no-evidence" challenge if the record shows one of the following: (1) a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson,* 168 S.W.3d 802, 810 (Tex.2005). In conducting a legal sufficiency review, a "court must consider evidence in the light most favorable to the verdict, and indulge every reasonable in-

ference that would support it." *Id.* at 822. If there is more than a scintilla of evidence to support the challenged finding, we must uphold it. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998). If the evidence offered to prove a vital fact is so weak that it only creates a "mere surmise or suspicion" of the existence of the fact, "the evidence is no more than a scintilla and, in legal effect, is no evidence.'" *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex. 2004) (quoting *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983)). However, if the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. *Keller,* 168 S.W.3d at 822; *see also King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex.2003). We may not substitute our judgment for that of the trier-of-fact "so long as the evidence falls within this zone of reasonable disagreement." *Keller,* 168 S.W.3d at 822.

▆▆▆ Generally, a defendant's fraudulent concealment of wrongdoing will toll the running of limitations. *Kerlin v. Sauceda,* 263 S.W.3d 920, 925 (Tex.2008) (citing *Shah v. Moss,* 67 S.W.3d 836, 841 (Tex.2001)); *see also Seureau v. ExxonMobil Corp.,* 274 S.W.3d 206, 228 (Tex. App.-Houston [14th Dist.] 2008, no pet.) ("[T]he fraudulent-concealment doctrine is an affirmative defense to limitations that resembles equitable estoppel"). To prove fraudulent concealment, a plaintiff must show that the defendant actually knew a wrong occurred, had a fixed purpose to conceal the wrong, and did conceal the wrong. *Shah,* 67 S.W.3d at 841; *see also Seureau,* 274 S.W.3d at 228 (stating that plaintiff must demonstrate defendant had "(1) actual knowledge that a wrong occurred, (2) a duty to disclose the wrong, and (3) a fixed purpose to conceal the wrong"); *Santanna Natural Gas v. Ha-*

*mon Operating Co.,* 954 S.W.2d 885, 890 (Tex.App.-Austin 1997, pet. denied) (defining elements of fraudulent concealment as "first, actual knowledge by the defendant that a wrong has occurred, and second, a fixed purpose to conceal the facts necessary for the plaintiff to know that it has a cause of action"). Accordingly, the "gist of the fraudulent concealment defense is the defendant's active suppression of the truth or its failure to disclose the truth when it is under a duty to speak." *Hay v. Shell Oil Co.,* 986 S.W.2d 772, 778 (Tex.App.-Corpus Christi 1999, pet. denied).

■■■ Importantly, however, fraudulent concealment will not "bar limitations when the plaintiff discovers the wrong or could have discovered it through the exercise of reasonable diligence." *Kerlin,* 263 S.W.3d at 925; *see also Shah,* 67 S.W.3d at 841 ("Fraudulent concealment tolls limitations until the plaintiff discovers the fraud or could have discovered the fraud with reasonable diligence."). Determining when a plaintiff knew or reasonably should have known of the cause of action is normally a question of fact. *Santanna Natural Gas,* 954 S.W.2d at 892.

In its first issue, Shell asserts that there is no evidence of the Rosses' "reliance on the October 18, 1995 letter." Garrison testified that Shell sent the October 1995 letter to "2,246 Texas royalty owners," but no one testified that the Rosses were among the royalty owners to whom Shell sent the letter. Ross's father testified that if Shell had sent the letter to the Rosses, he would have received the letter on his mother's behalf because in 1980, when his mother moved to Florida, he began receiving her royalty checks and depositing them for her. However, Ross's father did not remember ever having received the letter, and he stated that he had not relied on it. Additionally, the copy of the letter in the record is addressed to "Royalty Owner," not specifically to the Rosses.

Viewing the evidence in the light most favorable to the verdict, we hold that there is no evidence that the Rosses received or relied upon the October 1995 letter. Nevertheless, the trial court did not err in denying Shells' motions for directed verdict and judgment notwithstanding the verdict if the check stubs that Shell enclosed with its royalty statements support a finding of fraudulent concealment.

■■■ In its second issue, Shell asserts that there is no evidence that the Rosses relied on Shell's royalty statements or that "[Shell] knew that the 'unit price' on the Reuss check stubs was not the 'transfer price.'" Shell also asserts that the Rosses "could have, with the exercise of reasonable diligence, discovered that the 'unit price' on the Reuss check stubs did not reflect the 'transfer price' once Reuss received the October 18, 1995 letter." Shell contends that it had no "duty to state or disclose the exact price [it] received in an arms' length sale" in its royalty statements.

First, because there is no evidence that the Rosses received the October 1995 letter, the Rosses could not have discovered that the unit price in the royalty statements did not reflect the transfer price based on the October 1995 letter.

Second, regarding Shell's assertion that there is no evidence that the Rosses relied on the royalty statements, Ross's father testified that Shell usually enclosed royalty statements with his mother's royalty checks. He explained that he believed that the royalty statement provided a unit price of the gas that represented "whatever it was sold for." He did not "expect that [Shell] could pay [him] just any price they wanted to." Viewing the evidence in the light most favorable to the verdict, we hold that the evidence is legally sufficient

to support the jury's implied finding that Ross's father relied on Shell's misrepresentations in the royalty statements regarding the unit price of the gas.

■ Third, regarding Shell's assertion that there is no evidence or insufficient evidence that Shell knew that its royalty statements contained misrepresentations and that it knowingly underpaid royalties, we note that the evidence reveals that Shell underpaid royalties in at least two separate ways over a course of many years. There is evidence that Shell engaged in a practice of underpaying royalties by paying an arbitrary price, which was even different than an internal transfer price that Shell may have intended to base the price upon. There is also evidence from which a reasonable juror could conclude that Shell purposefully set up the internal transfer price as part of an effort to underpay royalties for its own benefit. In regard to the October 1995 letter, although there is no evidence that the Rosses received or relied upon the letter, the jury could have considered it as some evidence of Shell's continuing knowledge that it was underpaying royalties. Moreover, there is also evidence that, even after issuing the October 1995 letter to a number of royalty owners, Shell continued to underpay royalties owed to the Rosses and that it based the amounts of its payments on an arbitrary price.

In addition to the evidence showing that Shell had underpaid royalties in violation of the lease based upon an arbitrary price, there is also evidence, as discussed above, that Shell underpaid royalties using a "weighted average price" rather than the contracted-for actual price. Based upon the evidence presented, the jury could have reasonably concluded that this weighted average price was unauthorized under the lease. Although Shell argued that the lease should have been interpret-ed to authorize such a pricing mechanism, the jury was free to completely reject this and reasonably conclude that this mechanism was used by Shell to conceal the actual amount of royalty payments owed under the plain language of the lease and that Shell continued to make underpayments over the course of many years.

Finally, Shell argues that "an incorrect 'value' or 'unit price' reflected on a royalty owner's check stub cannot be fraudulent concealment" because Shell had no "duty to state or disclose the exact price [it] received in an arms' length sale" in its royalty statements. Ross argues that Shell had a duty to disclose "the actual sale price of [the] gas" because "the Natural Resources Code requires disclosure of the sale price of the gas under a proceeds lease."

When a person makes a payment to "a royalty interest owner from the proceeds derived from the sale of oil or gas production ... the person making the payment shall include" certain information in a "check stub or on an attachment to the payment form." TEX. NAT. RES.CODE ANN. § 91.501 (Vernon Supp. 2009). The check stub or attachment must include, among other things, the unit price, i.e., "the price per barrel or per MCF of oil or gas sold." *Id.* § 91.502 (Vernon Supp. 2009). However, the unit price may vary depending on the method used to calculate its price. *See Yzaguirre v. KCS Res., Inc.,* 53 S.W.3d 368, 372 (Tex.2001). For example, the unit price of gas may be calculated based on its market value or on the amount realized from its sale. *See id.* "Market value may be wholly unrelated to the price the lessee receives as the proceeds of a sales contract." *Id.* The statute does not explain whether the price of the oil or gas should be calculated based on market value, the amount realized, or some other method; nevertheless, the statute certainly requires

that the royalty statement include the price of the gas sold, not an arbitrary number. *See* Tex. Nat. Res.Code Ann. § 91.502.

■ Viewing the evidence in the light most favorable to the verdict, the unit price that Shell provided in its royalty statements did not reflect the price of the gas sold according to any method of calculation. Garrison testified that the unit price that Shell provided in its royalty statement, and used to calculate the Reuss royalties, was lower than both the "third-party sale price" and the transfer price. Additionally, Berghammer, Shell's expert witness, testified that the unit price "wasn't even close to being reflective of the index prices." Shell did not present any evidence that the unit price it provided in the Reuss royalty statements reflected the actual price of the gas sold using any method of calculation. Shell did have a duty to provide a unit price that was not arbitrary, and the evidence is legally sufficient to show that the unit price represented in the royalty statements did not reflect the actual price of the gas sold.

Accordingly, we hold that the trial court did not err in denying Shell's motions for a directed verdict and for judgment notwithstanding the verdict on the ground that the evidence is legally insufficient to show that Shell fraudulently concealed its underpayment of royalties to the Rosses.

We overrule Shell's first and second issues.

### Limitations

In its third and fifth issues, Shell argues that the trial court erred in denying its motion for judgment notwithstanding its verdict because there is no evidence to support the jury's finding that the Rosses, "in the exercise of reasonable diligence, [should] have discovered that Shell failed to pay royalty in accordance with the Reuss Lease" for royalty payments "between 1994 and 1997 for reasons other than the 'weighted average/blended price' issue" in 2002 and "between 1988 and April, 1994 because of the 'weighted average/blended price' issue" in "Feb. 6, 2006." Shell argues that the Rosses should have discovered Shell's underpayment of royalties sooner through the exercise of reasonable diligence because (1) the October 1995 letter provided the Reusses' with notice that Shell had been calculating their royalties on the basis of index prices, not sale prices; (2) the prices used to calculate the Land Office's royalties were different than the prices used to calculate the Reusses' royalties; and (3) the prices used to pay royalties on the Lasater and Houston wells, which were subject to the unitization and pooling agreements, were substantially lower than the prices on the other two wells.

■ Ross's breach of contract claim is governed by a four-year statute of limitations. Tex. Civ. Prac. & Rem.Code Ann. § 16.051 (Vernon 2008); *Stine v. Stewart*, 80 S.W.3d 586, 592 (Tex.2002). The limitations period begins to run when a contract is breached. *Stine*, 80 S.W.3d at 592. However, a defendant's fraudulent concealment of the breach tolls the statute of limitations until the fraud is discovered or should have been discovered with reasonable diligence. *Kerlin*, 263 S.W.3d at 925.

■ A party should discover a defendant's fraudulent concealment when the party learns of facts, conditions, or circumstances which would cause a reasonably prudent person to make inquiry, which, if pursued, would lead to discovery of the fraud. *Borderlon v. Peck*, 661 S.W.2d 907, 909 (Tex.1983). "Knowledge of such facts is in law equivalent to knowledge of the cause of action." *Id.*

First, having held that there is no evidence that the Rosses received the October 1995 letter, we conclude that there is no evidence that the letter provided the Rosses with facts which would cause a reasonably prudent person to make an inquiry which would lead to a discovery of the fraud. *See id.*

Second, regarding the difference between the gas prices used to calculate the Land Office's royalties and those used to calculate the Reusses' royalties, there is no evidence that any of the Rosses learned that Shell was using a higher price to calculate the royalties it paid to the Land Office than it used to calculate the Reusses' royalties. Thus, the Rosses could not have discovered Shell's fraudulent concealment merely because the Land Office received royalties on a higher gas price absent their knowledge of these facts.

Finally, regarding the lower unit prices of the Lasater and Houston wells, Shell provided the unit price information for the Reusses' wells in the royalty statements. Shell asserts that if Ross's "father looked carefully at the [statements], he would have seen there was a significant difference in the prices [Shell Western] used to pay royalties for the Lasater and Houston wells." In support of its argument that this fact would have caused a reasonably prudent royalty owner to inquire why these unit prices were lower, Shell relies on three cases: *Kerlin,* 263 S.W.3d 920; *Wagner & Brown, Ltd. v. Horwood,* 58 S.W.3d 732 (Tex.2001); and *HECI Exploration Co. v. Neel,* 982 S.W.2d 881 (Tex. 1998).

In *Kerlin,* the Texas Supreme Court determined that the plaintiff, Sauceda, or her predecessors in interest, should have discovered the existence of her claims through the exercise of due diligence, even though the defendant, Kerlin, had fraudulently concealed the basis of the claims.

*Kerlin,* 263 S.W.3d at 925. In 1937, Kerlin had contacted Primitivo Balli, who assisted him in collecting, from various family members, eleven general warranty deeds containing a reserved royalty interest. *Id.* at 922. Kerlin told the family members that he would use the deeds "to clear title to Padre Island, and that each deed would reserve a 1/64th of 1/8th royalty in each grantor." *Id.* In an ensuing lawsuit, Kerlin and his opposing parties reached a settlement agreement under which Kerlin received "the mineral interests in 1,000 acres of Padre Island located in Nueces County and fee simple title to 20,000 acres of land in the southern division of the island." *Id.* at 923. In 1953, thirteen years after the settlement agreement was reached, Primitivo Balli wrote two letters to Kerlin requesting documents showing Kerlin's interest in Padre Island. *Id.* Kerlin responded that he had not received title under the Ballis' deeds and that the Ballis had no claim to the land. *Id.* In 1985, a descendant of one of the Balli deed-holders, contacted Kerlin about the mineral interests reserved in the Balli deeds. *Id.* at 924. "Kerlin told her that the deeds were invalid, and that she would have the burden of proof in an expensive, time-consuming lawsuit to prove otherwise." *Id.*

In evaluating the circumstances in *Kerlin,* the court reasoned that "Kerlin's receipt of more than 20,000 acres in fee simple and 1,000 mineral acres were matters of public record more than forty years before the Ballis filed this lawsuit" and the Ballis "were on notice that the warranty deeds their predecessors executed contained royalty reservation, yet they never received any royalties"; therefore, "[a]s a matter of law, the Ballis could have discovered the existence of any claims before limitations expired through the exercise of reasonable diligence." *Id.* at 926.

We note that, in *Horwood* and *HECI*, the Texas Supreme Court analyzed the discovery rule, not the doctrine of fraudulent concealment.[4] *Horwood*, 58 S.W.3d at 734–35; *HECI*, 982 S.W.2d at 886–87. However, in *Kerlin*, the supreme court determined that its prior discovery rule cases were "instructive" in addressing the defense of fraudulent concealment and, more specifically, in determining when a plaintiff could discover claims through the exercise of reasonable diligence. *See Kerlin*, 263 S.W.3d at 925–26 ("Like fraudulent concealment, the discovery rule does not apply to claims that could have been discovered through the exercise of reasonable diligence. While the discovery rule differs from fraudulent concealment in that its applicability is determined on a categorical basis, *HECI* is nevertheless instructive in this case."). Accordingly, we agree with Shell that we should consider *Horwood* and *HECI* in our analysis of the applicability of fraudulent concealment.

In *Horwood*, royalty owners brought claims against a lessee for the underpayment of royalties as a result of the lessee's allegedly improper post-production charges that appeared on royalty statements that were provided to the owners. 58 S.W.3d at 736–37. In determining the applicability of the discovery rule, the supreme court noted that royalty owners have "some obligation to exercise reasonable diligence in protecting their interests," they may not rely on implied covenants to dispense with the need to exercise due diligence in enforcing their contractual rights, they should exercise due diligence to determine whether charges made against royalty payments are "proper and reasonable," and they should be "alerted to the need to perform additional investigation to protect their interests" when they receive statements listing fees charged. *Id.* at 735–36. The court further noted that royalty owners "may seek information necessary to assess the propriety of royalty calculations from the lessee" and other sources. *Id.* at 737. Turning to the facts before it, the supreme court then concluded that the royalty owners could have sought information about the improper post-production charges, which appeared on the royalty statements, from the lessee and from the gas purchasers. *Id.* (stating that "there were several sources of information available to [the royalty owners] from which they could have discovered the propriety of post-production charges"). In sum, the supreme court held that because the underpayments could have been discovered with the exercise of reasonable diligence, the royalty owners' injury was not inherently undiscoverable and, thus, the discovery rule did not apply. *Id.*

Similarly, in *HECI*, the supreme court considered the applicability of the discovery rule to royalty owners' claims against a lessee for breach of an implied covenant to notify them of a potential claim against a third party for damage to a common reservoir. 982 S.W.2d at 885. The lessee in *HECI* had discovered that a third-party producer on an adjoining lease had damaged the common reservoir through over-production, and the lessee had filed, and

---

4. In *Horwood*, the supreme court explained that "the discovery rule exception and tolling based on fraudulent concealment are distinct concepts that exist for different reasons" and that "[t]he fraudulent concealment doctrine, unlike the discovery rule, resembles equitable estoppel." *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 736 (Tex.2001). In evaluating the applicability of the discovery rule to claims brought by royalty owners against a lessee for the underpayment of royalties, the court noted that "[t]he fact that a lessee allegedly misrepresented information in a particular case may be relevant to the equitable principles involved in a fraudulent concealment analysis, but it does not affect the categorical determination of inherent undiscoverability in a discovery rule analysis." *Id.*

eventually settled, a lawsuit against the third party related to this damage. *Id.* at 884. More than four years after the damage, the royalty owners filed suit against the lessee, alleging that the lessee violated an implied covenant by failing to notify them of the need to sue the third party producer. *Id.* In concluding that the damage to the common reservoir was not inherently undiscoverable and that the discovery rule did not apply, the court stated that the royalty owners "had some obligation to exercise reasonable diligence in protecting their interests," including exercising reasonable diligence in determining whether a third party operators inflicted damage to the common reservoir. *Id.* at 886. The court explained that royalty owners could not remain "oblivious to the existence of other operators in the area or the existence of a common reservoir" and noted that "wells visible on neighboring properties may put royalty owners on inquiry." *Id.* The court also noted that "[r]ecords about operations in a common reservoir are also generally available at the Railroad Commission." *Id.* at 886–87.[5]

In contrast to the facts presented in *Kerlin, Horwood,* and *HECI,* the evidence presented in this case supports the jury's findings as to Shell's fraudulent concealment of its wrongful conduct and as to when the Rosses, with the exercise of reasonable diligence, could have discovered the wrongful conduct and their claims. Ross's father testified that he could not know that Shell was using an arbitrary unit price on its royalty statements until 2002, when Scott informed him that the unit price "was not what it should have been." Although the evidence presented at trial showed that the Rosses could have used available records to discover that the unit price on the Houston and Lasater wells was lower than the unit price on their other wells, the fact that the unit price was lower for these two wells would not have necessarily caused a reasonably prudent person to inquire about the lower price. Graham testified that the price of the natural gas could have been affected by the heat value, i.e., BTU, of the gas. Although the royalty statements contained Shell's representations about the amount of gas produced, they did not state the BTU of the gas. Graham testified that without knowing the BTU of the gas, an ordinary royalty owner would have no reason to believe that the unit price is incorrect. Berghammer, Shell's expert, also testified that "you would need the BTU to do an accurate comparison."

Accordingly, we hold that the evidence is legally sufficient to support the jury's finding that the Rosses should, "in the exercise of reasonable diligence, have discovered that Shell failed to pay royalty in accordance with the Reuss Lease" for reasons "other than the 'weighted average/blended price' issue" in "2002."

Regarding the "February 6, 2006" finding, Graham testified that, by reviewing Shell and El Paso Natural Gas internal documents, he first discovered Shell's use of a weighted average price after he began working on the Ross's case in November 2005. Plaintiff's Exhibit 27, the billing records for Ross's trial counsel, indicates that the first meeting between Graham and Ross's trial counsel occurred on February 6, 2006. In sum, unlike *Kerlin, Horwood,* and *HECI,* there is evidence in the record from which the jury could have

---

5. The court in *HECI* court carefully distinguished its analysis of the applicability of the discovery rule with the doctrine of fraudulent concealment, stating, "Of course, if an operator fraudulently concealed information from a lessee, decisions of this and other courts indicate that limitations may be tolled." *HECI Exploration Co. v. Neel,* 982 S.W.2d 881, 886 (Tex.1998).

reasonably concluded that there were no other sources of information from which the Rosses could have discovered (prior to the dates found by the jury) that Shell was under paying royalties under the lease for the reasons described above.[6]

Accordingly, we further hold that the evidence is legally sufficient to support the jury's finding that the Rosses should, "in the exercise of reasonable diligence, have discovered that Shell failed to pay royalty in accordance with the Reuss Lease" on the weighted average issue on "Feb. 6, 2006."

We overrule Shell's third and fifth issues.

### Constructive Notice Instruction

In its sixth issue, Shell argues that the trial court erred in not including its instruction on constructive notice because actual knowledge of Shell's underpayment of royalties "could have been acquired by examining public records."

▇▇▇ It is well-established that litigants have a right to a fair trial before a jury that is properly instructed on the issues authorized and supported by the law governing the case. *Harris County v. Smith*, 96 S.W.3d 230, 234 (Tex.2002). It is the duty of the trial court to submit only those questions, instructions, and definitions raised by the pleadings and the evidence. *Id.* at 236; *see* Tex.R. Civ. P. 278. A trial court's refusal to submit an instruction is reversible error if it "probably caused the rendition of an improper verdict." Tex.R.App. P. 44.1(a)(1).

▇▇▇ Constructive notice creates an irrebuttable presumption of actual notice in some circumstances. *HECI Exploration Co.*, 982 S.W.2d at 887. In support of

its argument that the Rosses could have been found to have had constructive notice because actual knowledge of the fraud could have been acquired by examining public records available at the Land Office, Shell relies on *Mooney v. Harlin*, 622 S.W.2d 83 (Tex.1981), and *Sherman v. Sipper*, 137 Tex. 85, 152 S.W.2d 319 (1941). However, these cases involve specific types of public records in specific situations. *See Mooney*, 622 S.W.2d at 85 ("Persons interested in an estate admitted to probate are charged with notice of the contents of the probate records."); *Sherman*, 152 S.W.2d at 321 ("Equally well settled is the rule that where a person had a right to property, and he claims fraudulent statements were made concerning the title to such property, when the records relating to such title are open to him he must exercise reasonable diligence to discover such defect...."). In both cases, the Court found a compelling rationale for imposing constructive notice. *HECI Exploration Co.*, 982 S.W.2d at 886–87. However, when the rationale for imposing constructive notice is lacking, public records have not been held to create an irrebuttable presumption of notice. *Id.* at 887; *see Andretta v. West*, 415 S.W.2d 638, 642 (Tex.1967); *see also Little v. Smith*, 943 S.W.2d 414, 421 (Tex.1997).

Having concluded that the Rosses could not have reasonably discovered Shell's fraudulent concealment based on public records at the Land Office, we further conclude that these public records did not create an irrebuttable presumption of notice. Therefore, the proposed instruction was inapplicable to the situation presented by the evidence in this case. Accordingly, we hold that the trial court did not err in

6. We note that Shell initially contended that it had not erred in calculating the royalty payments, although it later conceded error.

not submitting Shell's proposed instruction on constructive notice.

We overrule Shell's sixth issue.

### Conclusion

We affirm the judgment of the trial court.

Justice ALCALA, dissenting.

ELSA ALCALA, Justice, dissenting.

I respectfully dissent. I would hold that this lawsuit is barred by limitations because no evidence establishes fraudulent concealment. Between 1988 and 1997, Shell Oil Company ("Shell Oil") and Shell Western E & P ("Shell Western") (collectively "Shell") sent to Gertrude T. Reuss, the grandmother of appellee, Ralph Ross (collectively "the Rosses"), royalty payments accompanied by statements describing how the payment was calculated. Satisfied that the payments were correct, the Rosses accepted the royalty payments without complaint. After the limitations period expired, the Rosses filed suit in 2002 for underpayment of royalties. The Rosses contend that the limitations period was tolled by Shell's fraudulent concealment based on representations made in a 1995 letter and in royalty statements. *See Shah v. Moss,* 67 S.W.3d 836, 841 (Tex. 2001) (fraudulent concealment tolls limitation). I conclude that (I) the evidence conclusively shows that a reasonably diligent examination of documents would have revealed any misstatements within the period of limitations, and (II) no evidence shows that Shell used deception to conceal the wrong, nor that the Rosses relied on any representations by Shell. *See id.*

### I. No Evidence of Reasonable Diligence

I conclude that there is no evidence of fraudulent concealment because with rea-

sonable diligence the Rosses could have discovered any error in the royalty payments by (A) examining the lease; (B) understanding the royalty statements; (C) reviewing the Texas Natural Resources Code; and (D) requesting information from Shell. *See Kerlin v. Sauceda,* 263 S.W.3d 920, 925 (Tex.2008) (fraudulent concealment will not bar limitations when plaintiff could have discovered wrong through exercise of reasonable diligence).

#### A. The Lease

The Rosses should have examined their own lease to determine what royalty payments they were due. *See HECI Exploration Co. v. Neel,* 982 S.W.2d 881, 886–87 (Tex.1998) (in context of analogous discovery rule, stating that royalty owners should examine records). According to the lease here, Shell shall pay royalty, as follows:

> To pay lessor on gas and casinghead gas produced from said land (1) when sold by lessee, one-eighth of the amount realized by lessee, computed at the mouth of the well, or (2) when used by said lessee off said land or in the manufacture of gasoline or other products, the market value, at the mouth of the well, of one-eighth of such gas and casinghead gas.

*See Bowden v. Phillips Petroleum Co.,* 247 S.W.3d 690, n. 2 (Tex.2008) (analyzing identical language in lease). This type of lease is described by the Supreme Court of Texas, as follows:

> ... [T]he leases ... contain gas royalty clauses providing for an amount-realized basis if the gas is sold at the well by Phillips and a market-value basis if Phillips sells or consumes the gas off the premises or uses the gas to manufacture gasoline. This provision is called a "two-pronged" clause and provides different methods for calculating gas royalties for the same well depending on the circumstances of the sale.

*Id.* at 699. " 'Proceeds' or 'amount realized' clauses require measurement of the royalty based on the amount the lessee in fact receives under its sales contract for the gas." *Id.* "By contrast, a 'market value' or 'market price' clause requires payment of royalties based on the prevailing market price for gas in the vicinity at the time of sale, irrespective of the actual sale price." *Id.* "The market price may or may not be reflective of the price the operator actually obtains for the gas." *Id.* Under the Rosses' lease, therefore, if the gas was sold at their well, they were entitled to royalties from the amount Shell actually received under its sales contract for the gas, but if the gas was sold off premises or to manufacture gasoline, then they were entitled to royalties based on the prevailing market price. *See id.*

Until the end of 1993, Shell paid royalty to the Rosses on production from the G.T. Reuss # 1 and Reuss A wells based on the amount paid by the company purchasing the gas from Shell. The two Reuss wells were drilled on lands covered by the lease. Beginning in January 1994, Shell paid the Rosses based on an amount that was different than either the sales price to its affiliate or the sales price received from a third party. In October 1995, Shell implemented a policy to pay royalty based on the price received by its affiliate, and Shell sent a letter to 2,246 royalty owners at that time explaining the changed policy. Although the letter suggested royalties would be based on the "transfer price," Shell instead used some other price to calculate royalties on the Reuss wells after 1995. Out of the 45,000 royalty owners, nine or ten of them with the same type of lease or with nearby leases had been erroneously paid by using something other than the transfer price or market price. The royalty payment, therefore, was erroneous for the Reuss wells in that it was

based on something other than the actual sales price or market price.

During all the periods at issue in this appeal, Shell paid royalty to Reuss on production from the Lasater and Houston wells using a weighted average price. The Lasater and Houston wells were not drilled on lands covered by the lease. The Rosses' expert testified that it was improper to take the weighted average prices that Shell and Forest Oil had received from the sale of gas from the Lasater well, and that Shell, Forest Oil, and Marathon had received from the sale of gas from the Houston well. In short, the Rosses assert that only the sales related to parties in their same lease should have been considered for the market price. In contrast, Shell's expert testified it was proper and common to consider market prices in the vicinity at the time of the sale. Shell's position finds support in a recent decision by the Supreme Court of Texas that states that the market price "requires payment of royalties based on the prevailing market price for gas in the vicinity at the time of the sale, irrespective of the actual sales price." *Bowden*, 247 S.W.3d at 699. The royalty payment on the Lasater and Houston wells, therefore, was properly calculated.

Regardless of whether the royalty payments were properly calculated for these leases, the royalty owner would not be able to tell from the lease alone what method was used to calculate the royalties because the lease provides for either the sales price or the market price depending on the circumstances surrounding the sale of the gas. Although he would need to examine the terms of the lease to be reasonably diligent in understanding the two ways that royalties could be properly calculated under the lease, a royalty owner would need additional information outside the lease, such as information concerning whether the sale took place at the well or

somewhere else, to determine whether the royalty payment was correct.

## B. The Royalty Statements

The royalty statements use the terms "unit price" and "value," but those terms are not defined anywhere in the statement. The term "unit price" is not defined in the Natural Resource's Code, as explained in section C below. Because the term is not defined, "unit price" could refer to the actual price received, the market price, or some other price. As used by Shell, the "unit price" is the mathematical result of Shell's computer system dividing the "value" column by the "volume" column. As early as 1998, close examination of the statements would have shown the Rosses that the "unit price" for each of the pooled wells was less than the "unit price" for each of the two non-pooled wells, alerting them to the fact that the prices were being calculated differently for the wells. For example, in April 1992, the price for production from the Reuss wells was about $1.37 per MCF, but for the same month the price for production from the Houston well was about $1.00, and for the Lasater well it was about $0.86. From the fact that prices were different for the same period of time, a royalty owner would be alerted that the price was calculated differently depending on various circumstances. Although he would need to closely examine the data in the royalty statements, to be reasonably diligent a royalty owner would need to obtain additional information outside the royalty statements to determine whether the royalty payment was correct.

## C. The Natural Resources Code

The Rosses contend they did not question whether the royalty payments were correct because Shell was statutorily required to disclose the price that it received for the gas, which the Rosses contend relieved them of any duty to affirmatively seek information about the sales price of the gas. The Rosses accurately note that under the Natural Resources Code, payors must give royalty owners certain information in the statement that accompanies the payment, but they are incorrect that the Code relieves them of the obligation to obtain information from their contract partner. *See* TEX. NAT. RES.CODE ANN. § 91.501 (Vernon Supp. 2009) (if payment is made to royalty interest owner from proceeds derived from sale of oil or gas production pursuant to division order, lease, servitude, or other agreement, payor shall include information required by Section 91.502 of the code on the check stub, attachment to payment form, or another remittance advice). Under section 91.502 of the code, the royalty statement must include information identifying the lease, the time of the sale, the total amount of gas sold, the "price ... per MCF of ... gas sold, the total amount of taxes, the windfall profit tax paid," "any other deductions or adjustments," the net value of total sales after deductions, the owner's interest in sales from the lease, the owner's share of the total value of sales before any tax deductions, and the owner's share of the sales value less deductions. *Id.* § 91.502 (Vernon Supp. 2009). The Code does not specify whether the price per MCF of gas sold means the actual price that the gas was sold for by Shell at the well or the market price. *See id.* In a lease like this one that has a "two-pronged clause," a royalty owner could not reasonably rely on the Code's required reference to the price because the price could refer to actual price or market price, depending on the circumstances of the sale. Although he would need to examine the Natural Resources Code to be reasonably diligent, a royalty owner would need to do more than that because information required to be produced by the Code would

not explain how the royalties were calculated here.

**D. Information Requested from Shell**

In explaining that the burden to check the accuracy of statements falls on the parties to the lease, the Supreme Court of Texas states,

> Horwood and Glass claim that royalty owners should not bear the burden of discovering injuries of the sort asserted here. But expecting parties to discover improper charges like those alleged in this case is no more onerous than expecting software companies to detect the theft of trade secrets.... [T]hose who receive statements listing fees charged should be alerted to the need to perform additional investigation to protect their interests.

*See Wagner & Brown, Ltd. v. Horwood,* 58 S.W.3d 732, 737 (Tex.2001). The Rosses, however, contend that if they had contacted Shell they would not have received accurate information because, according to the Rosses' expert's opinion, "Shell is not cooperative with royalty owners." The expert's opinion is no evidence of fraudulent concealment for three reasons.

First, Shell is required by law to respond to requests for information made by its contracting partners. The Rosses could have discovered the errors in the amounts paid by asking their contract partner, Shell, for the information Shell used to determine the amount of the payment. *See id.* (in context of analogous discovery rule, stating, "Royalty owners may seek information necessary to assess the propriety of royalty calculations from the lessee"). The Code requires that statements accompanying royalty payments include "an address and telephone number at which additional information regarding the payment may be obtained and questions may be answered." *See* Tex.

Nat. Res.Code Ann. § 91.502. "Since 1986, section 91.504 of the Texas Natural Resource Code has required parties paying royalties to explain, upon a royalty owner's request, any deductions or adjustments that are not explained on check attachments." *See Horwood,* 58 S.W.3d at 736. The Code requires a lessee to respond to requests made by certified mail within thirty days of receiving the request. *Id.*

Second, evidence in the record shows that Shell would have provided the financial information to the Rosses if they had asked for it. Garrison, Shell's manager of the royalty owner's relations department, testified that if any of the Rosses had called Shell with questions about the methods used to calculate their royalties, Shell would have provided them with "information, pricing, volumes, and value." Garrison also testified,

> If the royalty owner wanted to know what the basis of the price was, we would provide them with that data, either sales receipts or a spreadsheet. It would depend on what they were asking and what the terms of their lease and contracts were.

Garrison testified that he spoke with royalty owners "constantly," but never received any inquiries concerning the Rosses' lease. Garrison reviewed his telephone call log and "found no evidence that anybody had called concerning [the Rosses]."

Third, deposition testimony by Garrison is no evidence of fraudulent concealment. The record shows the following testimony from Garrison.

> [Attorney]: All right. So at your first deposition, you testified that the unit price on the monthly statement represented the higher transfer price that was paid to SWEPI for Coral's ultimate sale price, correct?

[Garrison]: That's correct, in my first deposition.

In explaining why the deposition testimony was incorrect, the record shows, Garrison testified,

[Attorney]: ... How did you learn that the early testimony that you gave was false ... ?

[Garrison]: ... [W]hen we went back and collected that additional information to provide it to you, that's when we found out that we had not paid them on that price.

Although Garrison's deposition testimony given after the lawsuit was filed in 2002 was initially inaccurate, that is no evidence that Shell would have refused to provide information upon request or would have provided inaccurate information during the time the events were occurring between 1988 and 1997 or within four years of the events. Furthermore, the evidence shows that when the Rosses asked for "additional information," Shell's search for the requested information produced accurate results. If a request for "additional information" had been made within the period of limitations, it would have revealed the information necessary to timely file this lawsuit. The reason this lawsuit was not timely filed is because the Rosses slumbered on their rights by failing to use reasonable diligence to determine whether their contract partner was abiding by the terms of their agreement. Had the Rosses made an inquiry to Shell and had Shell refused to provide information or provided erroneous information, then fraudulent concealment would be shown, but the Rosses failure to inquire does not equate to fraudulent concealment by Shell. *See Horwood,* 58 S.W.3d at 735–37; *see, e.g., Via Net v. TIG Ins. Co.,* 211 S.W.3d 310, 314 (Tex.2006) (holding failure to ask for information from contract partner to verify contractual performance was not due diligence under discovery rule, but if "a contracting party responds to such a request with false information, accrual may be delayed for fraudulent concealment").

### E. Summary of Analysis

The Rosses made no effort to determine whether Shell was complying with the terms of their lease. Royalty owners are not entitled to "make[ ] no inquiry for years on end," and then sue for contractual breaches that could have been discovered within limitations period through the exercise of reasonable diligence by examination of documents available to them. *See Neel,* 982 S.W.2d at 887–88. The Rosses, as the "nonparticipating royalty interest owner[, were] a party to a contract and [were] charged with the duty of protecting [their] own interests." *See Harrison v. Bass Enters. Prod. Co.,* 888 S.W.2d 532, 538 (Tex. App.-Corpus Christi 1994, no writ). Ross could have discovered the wrong through the exercise of reasonable diligence. *See Kerlin,* 263 S.W.3d at 925; *Houston Endowment Inc. v. Atlantic Richfield Co.,* 972 S.W.2d 156, 163 (Tex.App.-Houston [14 Dist.] 1998, no pet.) (holding no evidence supported fraudulent concealment because plaintiff "should have looked further" when record showed HEI asserted Arco failed to disclose under payments, presented tax severance information that implied royalties were based on 100 percent of production, and concealed its actions). I would hold that Ross failed to exercise reasonable diligence, and therefore the limitations period was not tolled.

## II. No Evidence of Deception to Conceal or Reliance on Representation

Fraudulent concealment is not established because the Rosses cannot show Shell used deception to conceal its wrong, nor that the Rosses reasonably relied on representations made in the letter or

statements. *See Shah,* 67 S.W.3d at 841 (stating elements of fraudulent concealment). Evidence that Shell sent a letter in 1995 to royalty owners explaining its change in how royalty payments were calculated shows it was not attempting to conceal information about royalty payments. Furthermore, as the majority opinion points out, no evidence shows that the Rosses could have reasonably relied on representations in the 1995 letter because Ralph Ross, the person who handled all the correspondence related to the royalty payments, denied that he relied on it.

As explained above, the lease allowed for royalty payments to be based on the actual sales price at the well or on the market price, depending on the circumstances of the sale. The royalty statements referred to "unit price," but they did not describe to what that referred, and nothing in the lease or Natural Resources Code defines the term. Similarly, the Natural Resources Code calls for information about price, but it does not specify whether that should be based on the actual sales price at the well or on the market price. The Rosses made no effort to contact Shell for more information, even though the Code gave them the express right to the information. At best, the Rosses have shown misstatements by Shell. But misstatements alone do not equate to use of deception to conceal a wrong. I would hold that no evidence supports Ross's assertion of fraudulent concealment. *See Velsicol Chem. Corp. v. Winograd,* 956 S.W.2d 529, 531 (Tex.1997) (holding respondent could not rely on tolling doctrine of fraudulent concealment because respondent was aware of hazardous nature of chemical at time it accused petitioner of concealing dangers of chemical at issue); *Harrison,* 888 S.W.2d at 538 (holding no evidence supported Harrison's assertion of fraudulent concealment because Harrison had memo indicating production

on tract and inspection of his own accounts would have revealed no royalty payments from Bass).

### Conclusion

I would hold that the trial court erroneously denied the motions for directed verdict and for judgment notwithstanding the verdict because the evidence conclusively shows Shell did not fraudulently conceal underpayment of royalties. I would reverse and render judgment in favor of Shell.