IN THE SUPREME COURT OF TEXAS
 
════════════
No. 09-0399
════════════
 
BP America Production Company, 
Atlantic Richfield Company and Vastar Resources, Inc., 
Petitioners,
 
v.
 
Stanley G. Marshall, Jr., 
Robert Ray Marshall, Catherine Irene Marshall f/k/a Catherine I.M. Hashmi, and Margaret Ann Marshall f/k/a Margaret A.M. Jeffus, by and through David Jeffus, as Independent Executor of the Estate of Margaret 
Marshall, Respondents
 
════════════════════════════════════════════════════
On Petition for Review from 
the
Court of Appeals for the Fourth District of 
Texas
════════════════════════════════════════════════════
 
 
Argued December 7, 
2010
 
 
            
Justice Lehrmann delivered 
the opinion of the Court.
 
            
Justice Green did not 
participate in the decision.
 
 
            
This case involves two related oil and gas mineral lease disputes that were 
jointly tried.  One of the disputes is between petitioners BP America 
Production Co., Atlantic Richfield Co., and Vastar 
Resources, Inc. (collectively “BP”), the lessee and operator, and respondents 
the Marshall family, Stanley, Robert, Catherine, and Margaret Marshall, the 
lessors.  The other is a dispute between BP’s 
successors-in-interest, petitioners Wagner Oil Co. f/k/a Duer Wagner & Co., Jacque Oil & Gas Limited, Duer Wagner, Jr., Duer Wagner III, 
Bryan C. Wagner, James D. Finley, Dennis D. Corkran, 
David J. Andrews, H.E. Patterson, Brent Talbot, Scott Briggs, and Gysle R. Shellum (collectively 
“Wagner”), and another lessor, respondents Vaquillas Ranch Co., Ltd., Vaquillas Unproven Minerals, Ltd., and Vaquillas Proven Minerals, Ltd. (“Vaquillas”)[1].  We are asked to determine whether 
limitations barred the Marshalls’ fraud claim against BP, and whether Vaquillas lost 
title by adverse possession after Wagner succeeded to BP’s interests, took over 
the operations, and produced and paid Vaquillas 
royalties for nearly twenty years.
            
Based in part upon jury findings that BP had made fraudulent representations 
about its good-faith efforts to develop a well on the Marshall lease that the 
Marshalls could not have discovered before limitations expired, the trial court 
rendered judgment for the Marshalls.  It also rendered judgment for Wagner 
that Wagner had acquired the Marshall and Vaquillas 
leases by adverse possession.  The court of appeals affirmed the judgment 
against BP in most respects, and reversed the trial court’s judgment for 
Wagner.  288 S.W.3d 430, 438.  We reverse the 
court of appeals’ judgment and render judgment for Wagner and BP.  We hold 
that because the Marshalls’ injury was not inherently undiscoverable and BP’s 
fraudulent representations about its good faith efforts to develop the well 
could have been discovered with reasonable diligence before limitations expired, 
neither the discovery rule nor fraudulent concealment extended 
limitations.  Accordingly, the Marshalls’ fraud claims against BP were 
time-barred.  We further hold that by paying a clearly labeled royalty to 
Vaquillas, Wagner sufficiently asserted its intent to 
oust Vaquillas to acquire the lease by adverse 
possession.
I.  BACKGROUND
            
At the time of the dispute, fifty percent of the minerals under 17,712 acres in the Slator 
Ranch were owned by Tenneco and later assigned to Wagner; the other fifty 
percent were owned by a number of individuals and entities, including the 
Marshalls and the Vaquillas companies.  The 
Marshalls owned approximately 1/16 and Vaquillas owned 
approximately 1/4 of the minerals.  In the 1970s, BP[2] obtained oil and gas leases on the Slator Ranch from Tenneco, Vaquillas, the Marshalls, and other mineral owners not party 
to this dispute.  Their leases had a standard sixty-day savings clause 
providing that the lease would continue past the expiration date so long as BP 
was engaged in good-faith drilling or reworking operations designed to produce 
paying quantities of oil or gas with no cessation of operations for more than 
sixty days.
            
The primary terms of the Marshalls’ and Vaquillas’s 
leases were set to expire on July 11, 1980.  Two weeks before the 
expiration date, BP drilled a well, the J.O. Walker No. 1.  BP continued to 
work on the J.O. Walker No. 1 for the rest of the year, testing several zones in 
the well.  Seeing no production from the well after the lease expiration 
date, Stanley Marshall, a member of the Marshall family, contacted BP and was 
informed that the lease was kept alive by continuing operations.  A few 
days later, H.F. Young, the BP landman who spoke with 
Marshall, sent him a three-page letter purporting to document BP’s continuous operations.  BP listed a number of 
activities conducted on J.O. Walker No. 1, implying that good-faith efforts were 
continuing to invoke the sixty-day savings clause and retain the lease.  
The Marshalls, satisfied with BP’s response, did not investigate further.  
During the same period, Vaquillas representatives 
likewise inquired into the status of its lease, and received a copy of the same 
letter from Young.
            
On March 25, 1981, BP entered into a series of agreements with Sanchez-O’Brien 
Oil & Gas Corporation by which Sanchez-O’Brien eventually became the 
operator on a portion of the Slator Ranch.  The 
same day, BP decided to permanently plug and abandon the J.O. Walker No. 1 as 
unproductive.  Sanchez-O’Brien drilled its first, undisputedly productive, 
well in April 1981. Then, in August 1994, Sanchez-O’Brien  transferred its portion of the lease through a series 
of assignments to Fina Oil & Chemical Co., and 
ultimately to Wagner.
            
It is undisputed that there have been continuous operations on the lease from 
the day Sanchez-O’Brien began operations to the present.  At the time it 
obtained assignment of the Marshalls’ and Vaquillas’s 
leases from BP, Wagner was already operating in other portions of the Slator Ranch and held leases to fifty percent of the 
minerals.  Wagner regularly paid royalties upon obtaining the 
assignment.
            
In 1997, Vaquillas sued its lessee Wagner, BP, and 
other entities alleging breach of implied covenants to reasonably develop and 
market hydrocarbons under the lease.  During the course of discovery, Vaquillas’s experts came to believe that its original lease 
with BP, Wagner’s predecessor-in-interest, terminated in early January 1981 
because BP had abandoned any real efforts to rework the well and would not have 
expected it to produce in paying quantities when it continued operations in 
February and March.  Since drilling on the Sanchez-O'Brien well did not 
commence until April 13, 1981, more that sixty days 
later, Vaquillas asserted that the title to the 
leasehold reverted back to Vaquillas.  Vaquillas amended the lawsuit to seek a declaration of title 
to the mineral interest, contending that Wagner did not have title to the lease 
because the lease expired before BP transferred its interest in the leasehold to 
Wagner.
            
In 2001, the Marshalls intervened in the suit against BP and Wagner, similarly 
alleging that their lease had terminated in 1981 and adding that BP had 
defrauded them by purposefully concealing facts and circumstances demonstrating 
that the lease had already terminated.  Vaquillas 
settled its claims against BP and proceeded to trial only against Wagner.  
The Marshalls conceded that Wagner’s possession of the Marshall and Vaquillas leaseholds during the ten years following the 
alleged lapse in operations constituted adverse possession and proceeded to 
trial only on their fraud claims against BP.  They contended that because 
BP fraudulently concealed that the lease had expired, the four-year statute of 
limitations for fraud claims should be extended to the time they could have 
reasonably discovered the fraud — June 2000, when BP released internal documents 
on the J.O. Walker No. 1.  The Marshalls argued BP knew by the lease 
expiration date that the well was incapable of production and continued 
operations in bad faith until it could sell the lease to Sanchez-O’Brien.
            
At trial, the jury found in favor of the Marshalls and against BP, and the court 
rendered judgment on the verdict.  The Marshalls were granted: (1) a 
declaration that the Marshall lease with BP had terminated; (2) a declaration 
that BP's property interest had terminated and reverted to the Marshalls; (3) a 
court-ordered accounting and a transfer of an overriding royalty interest; (4) 
past compensatory damages of $1,127,749.00 for each Marshall family member based 
upon the jury’s fraud finding; (5) attorney's fees; and (6) prejudgment and 
post-judgment interest.  In the dispute between Vaquillas and Wagner, the jury found that: (1) Wagner had 
adversely possessed the leasehold; (2) Wagner was a bona fide purchaser; and (3) 
the failure of Vaquillas to timely file suit against 
Wagner was not excused.  The trial court rendered judgment for Wagner 
against the Vaquillas Companies and granted a directed 
verdict for Wagner against the Marshalls, ruling that Wagner had adversely 
possessed the mineral interest covered by its lease as to the Marshalls.
            
The court of appeals held there was legally sufficient evidence to support the 
jury’s finding that BP committed fraud against the Marshalls and Vaquillas, both affirmatively and by nondisclosure, and 
fraudulently concealed the facts necessary for Vaquillas and the Marshalls to know they had a cause of 
action for fraud against BP until June 29, 2000.  288 
S.W.3d at 452.  With respect to limitations, the court of appeals 
reasoned,
The discovery rule applies only to a limited category of cases, 
including cases involving fraud or fraudulent concealment.  (Citations 
omitted). Accordingly, BP America's argument based on whether the nature of the 
injury is inherently discoverable and the injury itself is objectively 
verifiable is inapplicable.  Because BP America does not challenge the 
jury's finding relating to the date of discovery, which is within the applicable 
limitations period, we overrule this portion of issue three.  We need not 
address BP America's claim that the Marshalls did not prove fraudulent 
concealment because the application of the discovery rule alone is sufficient to 
defeat BP America limitations defense.
288 S.W.3d at 452.  The court reversed the judgment 
awarding title to the leases to Wagner by adverse possession.  
Id.  We granted BP’s and Vaquillas’s 
petitions for review.  54 Tex. Sup. Ct. J. 1, 2 
(Oct. 1, 2010).
II.  LIMITATIONS
            
BP challenges the court of appeals’ ruling[3] that the Marshalls’ fraud claim was not 
barred by limitations.  BP asserts that the court of appeals erred in 
holding that the discovery rule exception to limitations applied to the 
Marshalls’ claims.  We agree that the discovery rule exception did not 
operate to defer accrual of the cause of action; however, this does not end our 
analysis.  We must also consider whether limitations were tolled by BP’s fraudulent concealment of the cessation of 
good faith operations.  We review the applicability of the discovery rule 
and fraudulent concealment as a matter of law and consider each doctrine in 
turn.
A.  
The discovery rule
            
We have recognized two doctrines that may apply to extend the statute of 
limitations.  Computer Assoc. Int’l, Inc. v. Altai, 
Inc., 918 S.W.2d 453, 455-56 (Tex. 1996).  Under the first, the 
discovery rule, the cause of action does not accrue until the injury could 
reasonably have been discovered.  See id.; S.V. v. R.V., 933 
S.W.2d 1, 4 (Tex. 1996) (citing Trinity River Auth. v. URS Consultants, 
Inc., 889 S.W.2d 259, 262 (Tex. 1994)), for the proposition that deferring 
accrual and thus delaying the commencement of the limitations period differs 
from suspending or tolling the running of limitations once the period has 
begun).  The discovery rule is applied categorically to instances in which 
“the nature of the injury incurred is inherently undiscoverable and the evidence 
of injury is objectively verifiable.”[4]  Altai, 918 
S.W.2d at 456.  An injury is not inherently undiscoverable when it 
is the type of injury that could be discovered through the exercise of 
reasonable diligence.  Wagner & Brown, Ltd. v. 
Horwood, 58 S.W.3d 732, 734–35 (Tex. 
2001).  Recognizing the social benefit in granting repose after a 
reasonable time, we have described the rule as a “‘very limited exception to 
statutes of limitations.’”  Id. at 734 (quoting Altai, 
918  S.W.2d at 455–56).
            
In Wagner & Brown, we held that the discovery rule categorically does 
not apply to defer the accrual of royalty owners’ claims for 
underpayments.  Id. at 737.  We 
reasoned that the injury was not inherently undiscoverable because royalty 
owners can timely discover such injuries through the exercise of due 
diligence.  Id.  We noted that, even though information that 
would have revealed the injury may not have been available from public records, 
it was nevertheless available from several other sources, including the lessee, 
its general partner, and gas purchasers.  Id.  Similarly, in 
HECI Exploration Co. v. Neel, 982 S.W.2d 881, 886 (Tex. 1998), we held 
that the discovery rule does not apply to claims arising from damage to a common 
oil and gas reservoir.  Noting that several sources of information about 
common reservoirs and operations are available to royalty owners, including 
Railroad Commission records, we held that such damage is categorically not 
inherently undiscoverable.  Id.
            
Information disclosing a lessee’s failure to continue good faith efforts to 
develop an oil and gas lease is available from the same sources recognized in 
Wagner & Brown and HECI, including public records.  In 
this case, the Marshalls’ expert testified that he determined BP operations in 
continuing to rework J.O. Walker No. 1 were not in good faith based on the 
well log and the plugging report filed with the Railroad Commission within the 
limitations period.  While the J.O. Walker No. 1 well log contained highly 
technical information regarding the resistivity, conductivity, and spontaneous 
potential at various intervals in the formation, it was this information 
regarding the reservoir’s geology that led the Marshalls’ expert to conclude 
that BP’s continued activities on the well were not in good faith.  
Although the expert came to this conclusion after being provided with internal 
BP documents indicating BP’s efforts to keep the lease alive, the log and the 
report were alone sufficient to discover what the expert ultimately concluded — 
that BP’s efforts to obtain production at shallow intervals after other 
intervals proved unsuccessful were not in good faith.  The expert 
acknowledged that anyone would have been able to obtain copies of the log and 
the report from the Commission records and reach the same conclusions.  
Although technical, the public documents concerning BP’s operations were 
available to the Marshalls.  While the Marshalls did not examine them until 
internal BP documents put this publicly available log information in context 
with BP’s efforts to keep the lease alive by continued operations, they could 
have.  It is not significant that BP’s internal documents helped the 
Marshalls discover the injury in this case, as the information was otherwise 
discoverable.  Because the Marshalls had a duty to exercise reasonable 
diligence in protecting their mineral interests, and since the low probability 
of success of BP’s continued operations could have been discovered with the 
exercise of reasonable diligence, the injury was not inherently 
undiscoverable.  See S.V. v. R.V., 933 S.W.2d at 
4.  Accordingly, the discovery rule did not delay the accrual of the 
Marshalls’ cause of action against BP.  See id.
B.  
Fraudulent concealment
            
The second doctrine that may extend the limitations period in this case is 
fraudulent concealment, an equitable doctrine that, unlike the discovery rule, 
is fact-specific.  In this case, the jury found that BP fraudulently 
concealed the cessation of good faith operations on the J.O. Walker No. 1 well, 
and that BP also fraudulently concealed the facts necessary for the Marshalls to 
know they had a cause of action available.  It further found that the 
Marshalls did not have knowledge “that would have required a reasonable and 
prudent person to make inquiry that . . . would have led to the discovery of” 
the cessation or operations or BP’s commission of fraud until June 2000.
            
A defendant’s fraudulent concealment of wrongdoing may toll the statute of 
limitations after the cause of action accrues.  See Kerlin v. Sauceda, 263 S.W.3d 
920, 925 (Tex. 2008); HECI , 982 S.W.2d at 
886.  A party asserting fraudulent concealment must establish an underlying 
wrong, and that “the defendant actually knew the plaintiff was in fact wronged, 
and concealed that fact to deceive the plaintiff.”  Earle v. Ratliff, 998 S.W.2d 882, 888 (Tex. 1999); Weaver 
v. Witt, 561 S.W.2d 792, 793 (Tex. 1977) (per curiam).  Fraudulent concealment only tolls the 
running of limitations until the fraud is discovered or could have been 
discovered with reasonable diligence.  Kerlin, S.W.3d at 925.
            
The Marshalls argue that only a reasonably diligent inquiry is required, and 
that they reasonably relied on representations in Young’s letter that operations 
continued in good faith.  We disagree.  We have repeatedly held that 
reasonable diligence obliges owners of property interests to make themselves 
aware of pertinent information available in the public record.  For 
example, in HECI, we held that oil and gas lessors had an obligation to exercise reasonable diligence 
in determining whether adjoining operators had inflicted damage to a common 
reservoir.  982 S.W.2d at 886.  We reasoned 
that materials publicly available from the Railroad Commission were “a ready 
source of information” that lessors could have 
reasonably explored to discover harm inflicted to their property.  Id. at 887.  And in Kerlin, we held that a deed holder’s descendants who 
had not received any royalties for minerals on the property, but who had been 
given notice that deeds executed by their predecessors contained a royalty 
reservation, could have discovered the existence of their claims for unpaid 
royalties by investigating public records of case settlements and 
conveyances.  263 S.W.3d at 926.
            
Because the Marshalls were obliged to perform additional investigation to 
protect their interests, if the Marshalls could have discovered BP’s wrongdoing 
by reviewing information available in the public record, or through means other 
than BP’s representations before limitations expired, they did not exercise 
reasonable diligence in relying on BP’s representations and limitations barred 
their claim.  The Marshalls argue that since memoranda indicating BP’s 
intentions in developing the well could only be obtained from the company’s 
internal records, the Marshalls could not have reasonably discovered a cause of 
action for fraud until June 2000, when those records were produced to them in 
the Vaquillas lawsuit.  BP responds that the 
Marshalls could have discovered any cessation of good faith operations and the 
existence of a cause of action against BP from publicly available sources before 
limitations had run.
            
The record in this case indicates that BP made verbal representations and sent 
the Marshalls a letter asserting it conducted continuous operations on the J.O. 
Walker No. 1 well.  The letter described a number of BP’s activities on the 
well, including testing the pressure and monitoring water flow in efforts to 
obtain production.  The letter also detailed recompletion efforts without 
stating they occurred at a shallower depth, the Upper Wilcox, after BP did not 
find the Lower Wilcox and lost hope of production from the Middle Wilcox, the 
depth it initially attempted to develop. 
            
Also contained within the record are internal BP memoranda indicating that the 
company had little expectation that continuing operations would prove successful.  The Marshalls argue that listing the 
operations in Young’s letter without stating they had a low possibility of 
success was fraudulent.  They point out that Young’s letter disclosed that 
on December 4 the well “flowed frac water to pit for 
two hours,” while failing to disclose that the well “blew down to zero in one 
minute” and began producing water[5] created a false impression that the well 
had a chance at being productive.  Had BP disclosed that the well blew down 
to zero in such a short time, the Marshalls argue that they would have 
questioned BP’s good faith in continuing operations on January 7, 1981.  
Moreover, the Marshalls’ expert testified that BP failed to disclose that it 
originally targeted the Lower Wilcox in drilling the well, and began operations 
at the Middle and Upper Wilcox intervals only after no Lower Wilcox deposits 
were found.  The expert testified that BP’s efforts to recomplete the well 
at the Upper Wilcox depth were not in good faith because a reasonable and 
prudent operator would know at that point that the well was never going to 
produce in paying quantities.  The Marshalls also argue that the letter 
misleadingly listed operations to recomplete the well without mentioning BP was 
targeting a different interval, the Upper Wilcox.  Had BP disclosed that it 
was conducting operations at a new depth, the Marshalls contend that they would 
have been more inclined to question whether such efforts were conducted in good 
faith.
            
However, to obtain the benefit of tolling based on fraudulent representations, 
the Marshalls had to establish that their reliance on the information BP 
provided was reasonable, and reliance is not reasonable when information 
revealing the truth could have been discovered within the limitations 
period.  See Arabian Shield Dev. Co. v. Hunt, 808 
S.W.2d 577, 584–85 (Tex. App.—Dallas 1991, writ ref. n.r.e.).  As we have noted, the information BP 
failed to disclose to the Marshalls was independently available from the 
Railroad Commission no later than October 1982, when BP filed the well log for 
J.O. Walker No. 1.  While the Marshalls are correct in pointing out 
that the well log did not list BP’s operations in the Upper Wilcox, the plugging 
report filed with the Commission’s Corpus Christi district office on October 6, 
1981, well within the limitations period, did.  These public documents, the 
well log and the plugging report, read together, would have led the Marshalls to 
discover that BP conducted operations at an interval incapable of 
production.  Moreover, Stanley Marshall testified that he was a 
sophisticated lessor who subscribed to industry 
publications, worked as a driller when he was younger, and thus understood the 
oil and gas industry.  Consequently, as a matter of law, the Marshalls 
would have been able to discover BP’s fraud though the use of reasonable 
diligence.  We therefore hold that the Marshalls’ claims are barred by the 
statute of limitations, and reverse and render for BP.
III.  ADVERSE POSSESSION
            
In the dispute between Wagner and Vaquillas, Wagner 
challenges the reversal of the trial court’s judgment that Wagner acquired title 
to the Vaquillas lease by adverse possession.  In 
support of the court of appeals’ judgment, Vaquillas 
argues that Wagner could not adversely possess the leasehold because its 
possession did not meet the requirements for adverse possession between 
cotenants. Vaquillas further argues that Wagner’s 
possession had to take place after Vaquillas’s cause 
of action accrued in June 2000, the date the jury found BP's fraud reasonably 
could have been discovered.  We disagree with both propositions. 
            
Under Texas law, adverse possession requires “an actual and visible 
appropriation of real property, commenced and continued under a claim of right 
that is inconsistent with and is hostile to the claim of another person.”  
Tex. Civ. Prac. & 
Rem. Code § 
16.021(1).  The statute requires visible 
appropriation; mistaken beliefs about ownership do not transfer title until 
someone acts on them.  Tran v. Macha, 213 
S.W.3d 913, 914 (Tex. 2006); Bywaters v. 
Gannon, 686 S.W.2d 593, 595 (Tex. 1985); see also Natural Gas Pipeline 
Co. of Am. v. Pool, 124 S.W.3d 188, 198 (Tex. 2003) (holding that “a record 
titleholder’s ignorance of what it owns does not affect the running of 
limitations”).
            
“A mineral estate, even when severed from the surface estate, may be adversely 
possessed under the various statutes of limitations,” so long as the statutory 
requirements are met.  See Pool, 124 S.W.3d at 
192–93.  Here, Wagner argued it established adverse possession under 
the three-, five-, and ten-year statutes of limitations.  The issue was 
submitted to the jury, and the jury determined that Wagner’s possession was 
sufficient to meet all three.  Vaquillas does not 
challenge the jury’s finding that Wagner possessed the leasehold for the 
requisite time.  The three-year statute of limitation states that the suit 
“to recover real property held by another in peaceable and adverse possession 
under title or color of title” must be brought “not later than three years after 
the day the cause of action accrues.”  Tex. Civ. Prac. & Rem. 
Code § 16.024.  The 
five-year statute requires the owner to bring suit within five years to recover 
property held by another in peaceable and adverse possession who cultivates, 
uses, or enjoys the property, pays taxes, and claims under a duly registered 
deed.  Id. § 16.025(a).  The ten-year 
statute requires suit “to recover real property held in peaceable and adverse 
possession by another who cultivates, uses, or enjoys the property.”  
Id.  § 16.026(a).
            
Vaquillas does not dispute that Wagner paid applicable 
taxes and claimed the lease under a duly registered deed.  Vaquillas’s suit was filed in 1997, well over ten years 
after the good faith operations allegedly ceased in January 1981.  During 
that time, Sanchez-O’Brien, its successors-in-interest, and then Wagner[6] claimed the lease, produced oil and gas, 
sold it, and paid Vaquillas a royalty.  Because 
the statute provides that the possessor may tack the time it held the leasehold 
with its predecessors-in-interest, Wagner would meet the ten-year statute of 
limitations by tacking its period of possession with Sanchez-O’Brien’s and Fina’s, so long as its actions met all other requirements of 
adverse possession.  See id.  § 16.023.  Accordingly, we 
need not consider the three- and five-year statutes of limitations.
            
The statute also requires that the possession be inconsistent with and hostile 
to the claims of all others.  Id.  § 16.021(1).  The 
“possession must be of such character as to indicate unmistakably an 
assertion of a claim of exclusive ownership in the occupant.”  Rhodes v. 
Cahill, 802 S.W.2d 643, 645 (Tex. 1990) (quoting Rick v. Grubbs, 214 
S.W.2d 925, 927 (Tex. 1948); McDonnold v. 
Weinacht, 465 S.W.2d 136, 141 (Tex. 1971).  
In an adverse possession claim between cotenants, the proponent must prove 
ouster — unequivocal, unmistakable, and hostile acts the possessor took to disseize other cotenants.  See 
King Ranch, Inc. v. Chapman, 118 S.W.3d 742, 
756 (Tex. 2003); Todd v. Bruner, 365 
S.W.2d 155, 159–60 (Tex. 1963).  Cotenants must surmount 
a more stringent requirement because acts of ownership “which, if done by a 
stranger, would per se be a disseizin” are not 
necessarily such when cotenants share an undivided interest.  Todd, 365 S.W.2d at 160 (internal citation 
omitted).
A.        Adverse 
possession between cotenants
            
The court of appeals held that Vaquillas’s and 
Wagner’s predecessor-in-interest became cotenants in April 1981, after the lease 
terminated due to cessation of good-faith operations.  288 S.W.3d at 460; 
see Wagner & Brown, Ltd. v. Sheppard, 282 S.W.3d 419, 421–22 (Tex. 
2008) (recognizing that a lessor became an unleased cotenant when the lease lapsed, and was entitled to 
a share of proceeds from minerals, less the lessor’s 
share of the costs of production and marketing).  Assuming that the lease 
had in fact terminated, Wagner then had to show it repudiated Vaquillas’s cotenancy interest to 
assert title by adverse possession.  See King Ranch, 118 S.W.3d at 756.  As a cotenant, Wagner had the right 
to drill, explore, and produce from the land, owing other cotenants an 
accounting for their portion of the minerals.  See Byrom v. Pendley, 717  S.W.2d 602, 605 (Tex. 1986).  In order to obtain 
title by adverse possession, Wagner had to show unmistakable and hostile acts 
that would put other cotenants on notice of its intent to oust them from the 
leasehold.  See Todd, 365 S.W.2d at 159–160; Poenisch v. Quarnstrom, 361 S.W.2d 367, 369 (Tex. 1962) (citation 
omitted).
            
The ouster standard that applies to cotenants differs from the adverse 
possession requirement courts impose between strangers because cotenants have 
rights to ownership and use of the property a stranger would not have.  
See Pool, 124 S.W.3d at 198 (noting that the finding of adverse 
possession is premised on the fact the parties were not cotenants).  Vaquillas argues that Wagner could not show ouster because 
its actions in drilling, producing, and paying royalties were consistent with 
its rights as a cotenant and thus could not be unmistakably exclusive and 
hostile.  We disagree that payment of royalties is consistent with the 
relationship between cotenants. 
            
The test for establishing adverse possession, both between strangers and 
cotenants, is whether the acts unmistakably assert a claim of “exclusive 
ownership” by the occupant.  See Rhodes, 802 S.W.2d at 645 (quoting 
Satterwhite v. Rosser, 61 Tex. 166 (1884)); Rick, 214 S.W.2d at 
927.  In Texas, unleased cotenants are generally 
entitled to “the value of the minerals taken less the necessary and reasonable 
cost of producing and marketing the same” as opposed to a fractional royalty 
from production paid to the lessor.  Cox v. Davison, 397 S.W.2d 200, 201 (Tex. 1965).  
In this case, it would mean that, absent a lessor/lessee relationship between Vaquillas and Wagner, Vaquillas 
would have been entitled to its share of the production for its 1/4 mineral 
interest in Slator Ranch minerals, minus reasonable 
costs.  Vaquillas’s expert testified regarding 
Wagner’s checks, which showed a royalty interest of 4.23 percent and not the 
cotenant share of approximately 25 percent that Vaquillas would have been entitled to as a cotenant, a 
significant and noticeable difference.  Wagner’s payment of royalties — not 
a cotenant’s share — to Vaquillas for the entire time 
it operated on the lease was thus an unmistakable and hostile assertion of 
exclusive ownership of the leasehold.  See Pool, 124 S.W.3d at 198.
            
In Pool, we held that producing hydrocarbons and paying a 1/8 royalty 
rather than a share of production for more than ten years after leases 
terminated established adverse possession by the lessee.  Id. at 197–98.  In reaching our decision, we 
expressly noted that the parties were not cotenants, and that production would 
not be sufficient evidence of disseizin in a cotenancy.  Id.  However, our statements in 
Pool were not meant to imply that adverse possession could never occur 
between cotenants, but rather to highlight that a stricter ouster standard 
applies.  Id.; see also Todd, 365 S.W.2d at 160 (holding that 
“if the acts of the respondents and their predecessors in title are susceptible 
of explanation consistent with the existence of the common title then such acts 
cannot . . . give constructive notice to the cotenants out of possession” 
(citation omitted)).  A cotenant’s use of the common property is presumed 
non-adverse unless the cotenant repudiates the title of its cotenant.  
See Todd, 365 S.W.2d at 156, 161.
            
Under Pool, drilling, production, and other routine operations by a 
cotenant would be consistent with a cotenancy and thus 
not unmistakably hostile.  Pool, 124 S.W.3d at 
197.  However, the same cannot be said about Wagner’s payment of a 
royalty rather than a significantly, noticeably larger cotenant’s share to Vaquillas.  Id.  It is undisputed that 
royalty checks were unmistakably labeled as royalties and contained payments of 
a 4.23 percent royalty interest.  The parties agree that Vaquillas accepted the checks, and even challenged their 
calculations over the course of Wagner’s operations.
            
By paying a royalty, Wagner asserted a lessor-lessee 
relationship in which Wagner, not Vaquillas, owned the 
leasehold.  Compare Coastal Oil & Gas Corp. v. Garza Energy 
Trust, 268 S.W.3d 1, 9 (Tex. 2008) (holding that the mineral lessor has only a royalty interest in the minerals), with 
Cox, 397 S.W.2d at 201 (holding that an unleased 
mineral cotenant is entitled to “the value of the minerals taken less the 
necessary and reasonable cost of producing and marketing the same”).  In 
addition, Vaquillas does not dispute other actions 
putting it on notice that Wagner acted as a lessee and not a cotenant, including 
division orders certifying that Vaquillas owned a 
royalty interest and not a cotenant’s share; correspondence from Vaquillas’s counsel recognizing a royalty interest; deed 
records recognizing a royalty interest and not a cotenant’s share; and Vaquillas’s expert’s annual review of production records for 
tax assessment purposes.  Accordingly, we hold that Wagner’s payment of a 
royalty and Vaquillas’s acceptance of it establish as 
a matter of law that Vaquillas was on notice that 
Wagner claimed to own the leasehold — an unmistakably hostile and unequivocal 
assertion of title inconsistent with the existence of a cotenant 
relationship.
B.  
Knowledge of lease termination
            
The court of appeals held that the evidence of drilling, production, and even 
payment of royalties and taxes was legally insufficient to support the jury’s 
verdict for Wagner because Vaquillas did not know the 
lease had terminated.  288 S.W.3d at 461.  
Again, we disagree.  We have previously held that adverse possession is not 
dependent on the possessor’s intent to assert title hostile to a known true 
owner, but rather on the “intent to claim the land.”  Calfee v. Duke, 544 S.W.2d 640, 642 (Tex. 
1976); see Tran, 213 S.W.3d at 915 (holding that hostile use “does not 
require an intention to dispossess the rightful owner, or even know that there 
is one”).
            
We note here, as we did in Pool, that Wagner was not required to give 
actual or constructive notice it was no longer claiming an interest under the 
lease in order to acquire title to the leasehold.  Pool, 124 S.W.3d at 195.  It was not the leases that Wagner’s 
possession must have been adverse to, but rather Vaquillas’s “title to all the minerals after the leases 
allegedly terminated.”  Id.   Wagner, like the lessees in 
Pool, continued to claim rights under the lease, and that claim 
was adverse to Vaquillas’s title once the lease 
terminated.  See id.
            
Because Wagner’s continued payment of royalties under the lease was an assertion 
of title, Wagner’s claim to be Vaquillas’s lessee for 
the statutorily mandated period ousted Vaquillas from 
the mineral estate.  It is immaterial whether Wagner asserted title with 
the intent to dispossess Vaquillas.  By accepting 
a clearly labeled and computed royalty, Vaquillas was 
on notice that Wagner claimed title to the leasehold — an unequivocal claim to 
ownership unmistakably inconsistent with and hostile to Vaquillas’s claim of a cotenant relationship.  
Accordingly, Wagner acquired the same interest it adversely possessed — a 
leasehold estate as defined by the original lease.  See Pool, 124 S.W.2d at 199.
C.  
Accrual of claims
            
Finally, Vaquillas argues that  
Wagner could not prove adverse possession because the statute requires 
possession to begin after the “cause of action” accrues.  See, e.g., Tex. Civ. Prac. & Rem. Code § 16.026(a) 
(“A person must bring suit not later than 10 years after the day the cause of 
action accrues to recover real property held in peaceable and adverse possession 
by another who cultivates, uses, or enjoys the property.”).  Vaquillas argues that since the jury determined that it did 
not have sufficient knowledge to put it on notice that BP had fraudulently 
concealed the cessation of good faith efforts to develop the well until 2000, 
Wagner’s claim to title based on adverse possession likewise did not accrue 
until June 2000.  We do not agree.
            
The structure of the adverse possession statute indicates that the “cause of 
action” refers to the suit “to recover real property held by another in 
peaceable and adverse possession.”  See id. §§ 16.024–026(a).  The statute thus requires the 
accrual of any claim Vaquillas may have had to assert 
its title to the leasehold against Wagner, rather than accrual of Vaquillas’s fraud or lease termination causes of action 
against BP, which it settled prior to trial.  Accordingly, the cause of 
action accrued when Wagner’s adverse possession began.  See Horton v. 
Crawford, 10 Tex. 382, 390–91 (Tex. 1853) (holding that a cause of action 
accrues “at the instant of possession taken under the circumstances specified in 
the statute”); see also Crow v. Payne, 242 S.W.2d 824, 825 (Tex. Civ. 
App.—Amarillo 1951, no writ).  Vaquillas’s 
argument that BP’s actions in concealing a lapse in production somehow prevented 
the accrual of Vaquillas’s claims against Wagner 
misconstrues the statute.
            
Moreover, Vaquillas’s argument is contrary to the 
jury’s unchallenged finding that Vaquillas’s failure 
to file suit within the limitations periods was not excused by BP’s 
misrepresentations or Vaquillas’s ignorance of the 
real facts.  Given that unchallenged finding, the court of appeals erred in 
reversing the trial court’s judgment recognizing Wagner’s title to the 
leasehold.
IV.  CONCLUSION
            
We reverse the court of appeals’ judgment as to both BP and Wagner.  We 
hold that the evidence conclusively established that BP’s fraud could have been 
discovered by the Marshalls through the exercise of reasonable diligence.  
We further hold that the court of appeals erred in reversing the trial court’s 
judgment awarding title to Vaquillas’s leasehold 
interest to Wagner.  Accordingly, we reverse and render for BP and 
Wagner.
 
                                                                        
_________________________________
                                                                        
Debra H. Lehrmann
                                                                        
Justice
 
OPINION 
DELIVERED: July 1, 2011






[1] 
The following entities submitted amicus briefs: 
the Texas Oil & Gas Association, Kelly Hart & Hallman LLP, and the Texas 
Land & Mineral Owners Association.

[2] 
The leases were executed by Atlantic Richfield Co. 
(ARCO), an entity later acquired by BP.  Given the number of entities 
involved in the dispute, we refer to ARCO as BP to avoid 
confusion.

[3] 
We address the dispute between BP and the 
Marshalls first, turning to the dispute between Vaquillas and Wagner in section III.

[4] 
We have occasionally distinguished between cases 
involving allegations of “fraud and fraudulent concealment [and cases] to which 
the discovery rule applies.”  See, e.g., S.V. 
v. R.V., 933 S.W.2d at 6.  BP reads our decisions to preclude 
the application of the discovery rule in all fraud cases and argues that the 
court of appeals therefore erred in its application.  We first note that 
the discovery rule delays the accrual of a cause of action, rather than tolling 
the statute of limitations after a cause of action has accrued.  See 
id.  However, because we agree with BP that the discovery rule does not 
apply to the Marshalls’ claim since their injury could have been discovered 
through the exercise of reasonable diligence, we do not decide whether the 
discovery rule would prevent accrual of a cause of action in instances where the 
fraud alleged is not aimed at concealing wrongdoing until limitations has 
run.  See id.

[5] 
At trial, the Marshalls’ expert explained that the 
disclosure was misleading because it created an impression that the only water 
coming from the well was the water pumped into the ground during recompletion, 
and concealed the fact that the well began producing its own water and was 
incapable of sustaining sufficient pressure to bring gas to the 
surface.

[6] 

Sanchez-O’Brien obtained an assignment from BP and 
drilled a productive well in April 1981.  It and its successor-in-interest 
continued operations until August 1994, when Wagner acquired the 
leasehold.  The parties do not dispute that all lessees conducted 
continuous good faith operations since April 
1981.